# KENTUCKY ASSOCIATION OF HEALTH PLANS, INC., ET AL. *v.* MILLER, COMMISSIONER, KENTUCKY DEPARTMENT OF INSURANCE

No. 00–1471.   Argued January 14, 2003—Decided April 2, 2003

SCALIA, J., delivered the opinion for a unanimous Court.

*Robert N. Eccles* argued the cause for petitioners. With him on the brief were *Karen M. Wahle, Jonathan D. Hacker,* and *Barbara Reid Hartung.*

*Elizabeth A. Johnson* argued the cause for respondent. With her on the brief were *Julie Mix McPeak* and *William J. Nold.*

*James A. Feldman* argued the cause for the United States as *amicus curiae* urging affirmance. With him on the brief were *Acting Solicitor General Clement, Deputy Solicitor General Kneedler, Howard M. Radzely, Allen H. Feldman, Nathaniel I. Spiller,* and *Gary K. Stearman.**

JUSTICE SCALIA delivered the opinion of the Court.

Kentucky law provides that "[a] health insurer shall not discriminate against any provider who is located within the geographic coverage area of the health benefit plan and who is willing to meet the terms and conditions for participation

---

*Briefs of *amici curiae* urging reversal were filed for the American Association of Health Plans, Inc., et al. by *Daly D. E. Temchine, Stephanie W. Kanwit, Jan S. Amundson,* and *Quentin Riegel;* for Community Health Partners et al. by *Thomas C. Goldstein* and *Amy Howe;* and for the Society for Human Resource Management by *Mark A. Casciari, Deborah S. Davidson,* and *James M. Nelson.*

Briefs of *amici curiae* urging affirmance were filed for the State of Texas et al. by *John Cornyn,* Attorney General of Texas, *Howard G. Baldwin, Jr.,* First Assistant Attorney General, *Jeffrey S. Boyd,* Deputy Attorney General, *Julie Parsley,* Solicitor General, and *David C. Mattax* and *Christopher Livingston,* Assistant Attorneys General, and by the Attorneys General and other officials for their respective jurisdictions as follows: *Bill Lockyer,* Attorney General of California, *Gregory D'Auria,* Associate Attorney General of Connecticut, *M. Jane Brady,* Attorney General of Delaware, *Robert A. Butterworth,* Attorney General of Florida, *Earl I. Anzai,* Attorney General of Hawaii, *James E. Ryan,* Attorney General of Illinois, *Albert B. Chandler III,* Attorney General of Kentucky, *J. Joseph Curran, Jr.,* Attorney General of Maryland, *W. A. Drew Edmondson,* Attorney General of Oklahoma, *Annina M. Mitchell,* Solicitor General of Utah, *Darrell V. McGraw, Jr.,* Attorney General of West Virginia, and *Anabelle Rodríguez,* Attorney General of Puerto Rico; for the American College of Legal Medicine by *Miles J. Zaremski, Gary Birnbaum,* and *Bruce A. Brightwell;* for the American Medical Association et al. by *Mark E. Rust* and *Stanley C. Fickle;* and for the Council of State Governments et al. by *Richard Ruda* and *Steven H. Goldblatt.*

established by the health insurer, including the Kentucky state Medicaid program and Medicaid partnerships." Ky. Rev. Stat. Ann. § 304.17A–270 (West 2001). Moreover, any "health benefit plan that includes chiropractic benefits shall . . . [p]ermit any licensed chiropractor who agrees to abide by the terms, conditions, reimbursement rates, and standards of quality of the health benefit plan to serve as a participating · primary chiropractic provider to any person covered by the plan." § 304.17A–171(2). We granted certiorari to decide whether the Employee Retirement Income Security Act of 1974 (ERISA) pre-empts either, or both, of these "Any Willing Provider" (AWP) statutes.

I

Petitioners include several health maintenance organizations (HMOs) and a Kentucky-based association of HMOs. In order to control the quality and cost of health-care delivery, these HMOs have contracted with selected doctors, hospitals, and other health-care providers to create exclusive "provider networks." Providers in such networks agree to render health-care services to the HMOs' subscribers at discounted rates and to comply with other contractual requirements. In return, they receive the benefit of patient volume higher than that achieved by nonnetwork providers who lack access to petitioners' subscribers.

Kentucky's AWP statutes impair petitioners' ability to limit the number of providers with access to their networks, and thus their ability to use the assurance of high patient volume as the *quid pro quo* for the discounted rates that network membership entails. Petitioners believe that AWP laws will frustrate their efforts at cost and quality control, and will ultimately deny consumers the benefit of their cost-reducing arrangements with providers.

In April 1997, petitioners filed suit against respondent, the Commissioner of Kentucky's Department of Insurance, in the United States District Court for the Eastern District

of Kentucky, asserting that ERISA, 88 Stat. 832, as amended, pre-empts Kentucky's AWP laws. ERISA pre-empts all state laws "insofar as they may now or hereafter relate to any employee benefit plan," 29 U. S. C. § 1144(a), but state "law[s] . . . which regulat[e] insurance, banking, or securities" are saved from pre-emption, § 1144(b)(2)(A). The District Court concluded that although both AWP statutes "relate to" employee benefit plans under § 1144(a), each law "regulates insurance" and is therefore saved from pre-emption by § 1144(b)(2)(A). App. to Pet. for Cert. 64a–84a. In affirming the District Court, the Sixth Circuit also concluded that the AWP laws "regulat[e] insurance" and fall within ERISA's saving clause. *Kentucky Assn. of Health Plans, Inc.* v. *Nichols*, 227 F. 3d 352, 363–372 (2000). Relying on *UNUM Life Ins. Co. of America* v. *Ward*, 526 U. S. 358 (1999), the Sixth Circuit first held that Kentucky's AWP laws regulate insurance "as a matter of common sense," 227 F. 3d, at 364, because they are "specifically directed toward 'insurers' and the insurance industry . . . ," *id.*, at 366. The Sixth Circuit then considered, as "checking points or guideposts" in its analysis, the three factors used to determine whether a practice fits within "the business of health insurance" in our cases interpreting the McCarran-Ferguson Act. *Id.*, at 364. These factors are: "*first*, whether the practice has the effect of transferring or spreading a policyholder's risk; *second*, whether the practice is an integral part of the policy relationship between the insurer and the insured; and *third*, whether the practice is limited to entities within the insurance industry." *Union Labor Life Ins. Co.* v. *Pireno*, 458 U. S. 119, 129 (1982). The Sixth Circuit found all three factors satisfied. 227 F. 3d, at 368–371. Notwithstanding its analysis of the McCarran-Ferguson factors, the Sixth Circuit reiterated that the "basic test" under ERISA's saving clause is whether, from a commonsense view, the Kentucky AWP laws regulate insurance. *Id.*, at 372. Finding that the laws passed both the "common sense" test and the

McCarran-Ferguson "checking points," the Sixth Circuit upheld Kentucky's AWP statutes. *Ibid.*

We granted certiorari, 536 U. S. 956 (2002).

## II

To determine whether Kentucky's AWP statutes are saved from pre-emption, we must ascertain whether they are "law[s] . . . which regulat[e] insurance" under § 1144(b)(2)(A).

It is well established in our case law that a state law must be "specifically directed toward" the insurance industry in order to fall under ERISA's saving clause; laws of general application that have some bearing on insurers do not qualify. *Pilot Life Ins. Co.* v. *Dedeaux,* 481 U. S. 41, 50 (1987); see also *Rush Prudential HMO, Inc.* v. *Moran,* 536 U. S. 355, 366 (2002); *FMC Corp.* v. *Holliday,* 498 U. S. 52, 61 (1990). At the same time, not all state laws "specifically directed toward" the insurance industry will be covered by § 1144(b)(2)(A), which saves laws that regulate *insurance,* not insurers. As we explained in *Rush Prudential,* insurers must be regulated "with respect to their insurance practices," 536 U. S., at 366. Petitioners contend that Kentucky's AWP laws fall outside the scope of § 1144(b)(2)(A) for two reasons. First, because Kentucky has failed to "specifically direc[t]" its AWP laws toward the insurance industry; and second, because the AWP laws do not regulate an insurance practice. We find neither contention persuasive.

## A

Petitioners claim that Kentucky's statutes are not "specifically directed toward" insurers because they regulate not only the insurance industry but also doctors who seek to form and maintain limited provider networks with HMOs. That is to say, the AWP laws equally prevent *providers* from entering into limited network contracts with *insurers,* just as they prevent insurers from creating exclusive networks in the first place. We do not think it follows that Kentucky

has failed to specifically direct its AWP laws at the insurance industry.

Neither of Kentucky's AWP statutes, by its terms, imposes any prohibitions or requirements on health-care providers. See Ky. Rev. Stat. Ann. § 304.17A–270 (West 2001) (imposing obligations only on "health insurer[s]" not to discriminate against any willing provider); § 304.17A–171 (imposing obligations only on "health benefit plan[s] that includ[e] chiropractic benefits"). And Kentucky health-care providers are still capable of entering exclusive networks with insurers who conduct business outside the Commonwealth of Kentucky or who are otherwise not covered by §§ 304.17A–270 or 304.17A–171. Kentucky's statutes are transgressed only when a "health insurer," or a "health benefit plan that includes chiropractic benefits," excludes from its network a provider who is willing and able to meet its terms.

It is of course true that as a *consequence* of Kentucky's AWP laws, entities outside the insurance industry (such as health-care providers) will be unable to enter into certain agreements with Kentucky insurers. But the same could be said about the state laws we held saved from pre-emption in *FMC Corp.* and *Rush Prudential.* Pennsylvania's law prohibiting insurers from exercising subrogation rights against an insured's tort recovery, see *FMC Corp., supra,* at 55, n. 1, also prevented insureds from entering into enforceable contracts with insurers allowing subrogation. Illinois' requirement that HMOs provide independent review of whether services are "medically necessary," *Rush Prudential, supra,* at 372, likewise excluded insureds from joining an HMO that would have withheld the right to independent review in exchange for a lower premium. Yet neither case found the effects of these laws on noninsurers, significant though they may have been, inconsistent with the requirement that laws saved from pre-emption by § 1144(b)(2)(A) be "specifically directed toward" the insurance industry. Regulations "directed toward" certain entities will almost always disable

other entities from doing, with the regulated entities, what the regulations forbid; this does not suffice to place such regulation outside the scope of ERISA's saving clause.[1]

---

[1] Petitioners also contend that Ky. Rev. Stat. Ann. § 304.17A–270 (West 2001) is not "specifically directed toward" insurers because it applies to "self-insurer or multiple employer welfare arrangement[s] not exempt from state regulation by ERISA." § 304.17A–005(23). We do not think § 304.17A–270's application to self-insured non-ERISA plans forfeits its status as a "law . . . which regulates insurance" under 29 U. S. C. § 1144(b)(2)(A). ERISA's saving clause does not require that a state law regulate "insurance *companies*" or even "*the business of insurance*" to be saved from pre-emption; it need only be a "law . . . which regulates *insurance*," *ibid.* (emphasis added), and self-insured plans engage in the same sort of risk pooling arrangements as separate entities that provide insurance to an employee benefit plan. Any contrary view would render superfluous ERISA's "deemer clause," § 1144(b)(2)(B), which provides that an employee benefit plan covered by ERISA may not "be deemed to be an insurance company or other insurer . . . or to be engaged in the business of insurance . . . for purposes of any law of any State purporting to regulate insurance companies [or] insurance contracts. . . ." That clause has effect only on state laws saved from pre-emption by § 1144(b)(2)(A) that would, in the absence of § 1144(b)(2)(B), be allowed to regulate self-insured employee benefit plans. Under petitioners' view, such laws would never be saved from pre-emption in the first place. (The deemer clause presents no obstacle to Kentucky's law, which reaches only those employee benefit plans "not exempt from state regulation by ERISA.")

Both of Kentucky's AWP laws apply to all HMOs, including HMOs that do not act as insurers but instead provide only administrative services to self-insured plans. Petitioners maintain that the application to noninsuring HMOs forfeits the laws' status as "law[s] . . . which regulat[e] insurance." § 1144(b)(2)(A). We disagree. To begin with, these noninsuring HMOs would be administering self-insured plans, which we think suffices to bring them within the activity of insurance for purposes of § 1144(b)(2)(A). Moreover, we think petitioners' argument is foreclosed by *Rush Prudential HMO, Inc.* v. *Moran,* 536 U. S. 355, 372 (2002), where we noted that Illinois' independent-review laws contained "some overbreadth in the application of [215 Ill. Comp. Stat., ch. 125,] § 4–10 [(2000)] beyond orthodox HMOs," yet held that "there is no reason to think Congress would have meant such minimal application to noninsurers to remove a state law entirely from the category of insurance regulation saved from preemption."

## B

Petitioners claim that the AWP laws do not regulate insurers with respect to an insurance practice because, unlike the state laws we held saved from pre-emption in *Metropolitan Life Ins. Co.* v. *Massachusetts*, 471 U. S. 724 (1985), *UNUM*, and *Rush Prudential*, they do not control the actual terms of insurance policies. Rather, they focus upon the relationship between an insurer and *third-party providers*—which in petitioners' view does not constitute an "insurance practice."

In support of their contention, petitioners rely on *Group Life & Health Ins. Co.* v. *Royal Drug Co.*, 440 U. S. 205, 210 (1979), which held that third-party provider arrangements between insurers and pharmacies were not "the 'business of insurance'" under § 2(b) of the McCarran-Ferguson Act.[2] ERISA's saving clause, however, is not concerned (as is the McCarran-Ferguson Act provision) with how to characterize *conduct* undertaken by private actors, but with how to characterize *state laws* in regard to what they "regulate." It does not follow from *Royal Drug* that a law mandating certain insurer-provider relationships fails to "regulate insurance." Suppose a state law required all licensed attorneys to participate in 10 hours of continuing legal education (CLE) each year. This statute "regulates" the practice of law—

---

[2] Section 2 of the McCarran-Ferguson Act provides:

"(a) *The business of insurance*, and every person engaged therein, shall be subject to the laws of the several States which relate to the regulation or taxation of such business.

"(b) No Act of Congress shall be construed to invalidate, impair, or supersede *any law enacted by any State for the purpose of regulating the business of insurance*, or which imposes a fee or tax upon such business, unless such Act specifically relates to the business of insurance: *Provided*, That after June 30, 1948, the Act of July 2, 1890, as amended, known as the Sherman Act, and the Act of October 15, 1914, as amended, known as the Clayton Act, and the Act of September 26, 1914, known as the Federal Trade Commission Act, as amended, shall be applicable to the business of insurance to the extent that such business is not regulated by State law." 59 Stat. 34, 15 U. S. C. § 1012 (emphasis added).

even though sitting through 10 hours of CLE classes does not constitute the practice of law—because the State has *conditioned* the right to practice law on certain requirements, which substantially affect the product delivered by lawyers to their clients. Kentucky's AWP laws operate in a similar manner with respect to the insurance industry: Those who wish to provide health insurance in Kentucky (any "health insurer") may not discriminate against any willing provider. This "regulates" insurance by imposing conditions on the right to engage in the business of insurance; whether or not an HMO's contracts with providers constitute "the business of insurance" under *Royal Drug* is beside the point.

We emphasize that conditions on the right to engage in the business of insurance must also substantially affect the risk pooling arrangement between the insurer and the insured to be covered by ERISA's saving clause. Otherwise, any state law aimed at insurance companies could be deemed a law that "regulates insurance," contrary to our interpretation of § 1144(b)(2)(A) in *Rush Prudential*, 536 U. S., at 364. A state law requiring all insurance companies to pay their janitors twice the minimum wage would not "regulate insurance," even though it would be a prerequisite to engaging in the business of insurance, because it does not substantially affect the risk pooling arrangement undertaken by insurer and insured. Petitioners contend that Kentucky's AWP statutes fail this test as well, since they do not alter or affect the terms of insurance policies, but concern only the relationship between insureds and third-party providers, Brief for Petitioners 29. We disagree. We have never held that state laws must alter or control the actual terms of insurance policies to be deemed "laws . . . which regulat[e] insurance" under § 1144(b)(2)(A); it suffices that they substantially affect the risk pooling arrangement between insurer and insured. By expanding the number of providers from whom an insured may receive health services, AWP laws alter the scope

of permissible bargains between insurers and insureds in a manner similar to the mandated-benefit laws we upheld in *Metropolitan Life*, the notice-prejudice rule we sustained in *UNUM*,[3] and the independent-review provisions we approved in *Rush Prudential*. No longer may Kentucky insureds seek insurance from a closed network of health-care providers in exchange for a lower premium. The AWP prohibition substantially affects the type of risk pooling arrangements that insurers may offer.

## III

Our prior decisions construing § 1144(b)(2)(A) have relied, to varying degrees, on our cases interpreting §§ 2(a) and 2(b) of the McCarran-Ferguson Act. In determining whether certain practices constitute "the *business of* insurance" under the McCarran-Ferguson Act (emphasis added), our cases have looked to three factors: "*first*, whether the practice has the effect of transferring or spreading a policyholder's risk; *second*, whether the practice is an integral part of the policy relationship between the insurer and the insured; and *third*, whether the practice is limited to entities within the insurance industry." *Pireno*, 458 U. S., at 129.

We believe that our use of the McCarran-Ferguson case law in the ERISA context has misdirected attention, failed

---

[3] While the Ninth Circuit concluded in *Cisneros v. UNUM Life Ins. Co. of America*, 134 F. 3d 939, 945–946 (1998), aff'd in part, rev'd and remanded in part, *UNUM Life Ins. Co. of America v. Ward*, 526 U. S. 358 (1999), that "the notice-prejudice rule does not spread the policyholder's risk within the meaning of the first McCarran-Ferguson factor," our test requires only that the state law substantially *affect* the risk pooling arrangement between the insurer and insured; it does not require that the state law actually spread risk. See *supra*, at 337–338. The notice-prejudice rule governs whether or not an insurance company must cover claims submitted late, which dictates to the insurance company the conditions under which it must pay for the risk that it has assumed. This certainly qualifies as a substantial effect on the risk pooling arrangement between the insurer and insured.

to provide clear guidance to lower federal courts, and, as this case demonstrates, added little to the relevant analysis. That is unsurprising, since the statutory language of § 1144(b)(2)(A) differs substantially from that of the McCarran-Ferguson Act. Rather than concerning itself with whether certain practices constitute "[t]he business of insurance," 15 U. S. C. § 1012(a), or whether a state law was "enacted . . . *for the purpose of* regulating the business of insurance," § 1012(b) (emphasis added), 29 U. S. C. § 1144(b)(2)(A) asks merely whether a state law is a "law . . . which regulates insurance, banking, or securities." What is more, the McCarran-Ferguson factors were developed in cases that characterized *conduct* by private actors, not state laws. See *Pireno, supra,* at 126 ("The only issue before us is *whether petitioners' peer review practices* are exempt from antitrust scrutiny as part of the 'business of insurance'" (emphasis added)); *Royal Drug,* 440 U. S., at 210 ("The only issue before us is whether the Court of Appeals was correct in concluding that *these Pharmacy Agreements* are not the 'business of insurance' within the meaning of § 2(b) of the McCarran-Ferguson Act" (emphasis added)).

Our holdings in *UNUM* and *Rush Prudential*—that a state law may fail the first McCarran-Ferguson factor yet still be saved from pre-emption under § 1144(b)(2)(A)—raise more questions than they answer and provide wide opportunities for divergent outcomes. May a state law satisfy *any* two of the three McCarran-Ferguson factors and still fall under the saving clause? Just one? What happens if two of three factors are satisfied, but not "securely satisfied" or "clearly satisfied," as they were in *UNUM* and *Rush Prudential?* 526 U. S., at 374; 536 U. S., at 373. Further confusion arises from the question whether the *state law itself* or the *conduct regulated by that law* is the proper subject to which one applies the McCarran-Ferguson factors. In *Pilot Life,* we inquired whether Mississippi's *law of bad faith* has the effect of transferring or spreading risk, 481 U. S., at 50,

whether *that law* is integral to the insurer-insured relationship, *id.*, at 51, and whether *that law* is limited to the insurance industry, *ibid.*[4] *Rush Prudential*, by contrast, focused the McCarran-Ferguson inquiry on the *conduct regulated* by the state law, rather than the state law itself. 536 U. S., at 373 ("It is obvious enough that the independent review requirement *regulates* 'an integral part of the policy relationship between the insurer and insured'" (emphasis added)); *id.*, at 374 ("The final factor, that the law be aimed at a *'practice* . . . limited to entities within the insurance industry' is satisfied . . ." (emphasis added; citation omitted)).

We have never held that the McCarran-Ferguson factors are an essential component of the § 1144(b)(2)(A) inquiry. *Metropolitan Life* initially used these factors only to buttress its previously reached conclusion that Massachusetts' mandated-benefit statute was a "law . . . which regulates insurance" under § 1144(b)(2)(A). 471 U. S., at 742–743. *Pilot Life* referred to them as mere "considerations [to be] weighed" in determining whether a state law falls under the saving clause. 481 U. S., at 49. *UNUM* emphasized that the McCarran-Ferguson factors were not "'require[d]'" in the saving clause analysis, and were only "checking points" to be used after determining whether the state law regulates insurance from a "common-sense" understanding. 526 U. S., at 374. And *Rush Prudential* called the factors "guideposts," using them only to "confirm our conclusion" that Illinois' statute regulated insurance under § 1144(b)(2)(A). 536 U. S., at 373.

Today we make a clean break from the McCarran-Ferguson factors and hold that for a state law to be deemed a "law . . . which regulates insurance" under § 1144(b)(2)(A),

---

[4] This approach rendered the third McCarran-Ferguson factor a mere repetition of the prior inquiry into whether a state law is "specifically directed toward" the insurance industry under the "common-sense view." *UNUM Life Ins. Co. of America* v. *Ward, supra,* at 375; *Pilot Life Ins. Co.* v. *Dedeaux,* 481 U. S. 41, 50 (1987).

it must satisfy two requirements. First, the state law must be specifically directed toward entities engaged in insurance. See *Pilot Life, supra,* at 50, *UNUM, supra,* at 368; *Rush Prudential, supra,* at 366. Second, as explained above, the state law must substantially affect the risk pooling arrangement between the insurer and the insured. Kentucky's law satisfies each of these requirements.

*   *   *

For these reasons, we affirm the judgment of the Sixth Circuit.

*It is so ordered.*