**BENEFIT CONCEPTS, as Plan Administrator for Don Rosen Cadillac Employee Medical Plan**

v.

**Carmelann MACERA**

No. Civ.A. 04–183.

United States District Court,
E.D. Pennsylvania.

June 6, 2005.

Andrew Marshall Smith, Bateman & Smith, PC, Philadelphia, PA, for Benefit Concepts, as Plan Administrator for Don Rosen Cadillac Employee Medical Plan.

Jerry Lyons, Joseph Chaiken & Associates, PC, Philadelphia, PA, for Carmelann Macera.

## MEMORANDUM

DALZELL, District Judge.

This case requires us to determine the effect of a Pennsylvania insurance statute on an employee benefit plan's subrogation rights. The parties' cross-motions for summary judgment[1] are before us.

---

1. Summary judgment is appropriate if there    is no genuine issue of material fact and the

*Factual Background* [2]

On April 1, 1997, Howard E. Dade, Sr. caused an automobile accident in which Carmelann Macera's back and left shoulder were injured. At the time of the accident, Allstate Insurance Company ("Allstate") provided automobile insurance to Dade.[3] *See* Pl.'s Mem. Ex. I.

Macera had her own automobile insurance policy with Allstate, which provided up to $10,000 of personal injury protection. In addition, Macera received her health insurance through the Don Rosen Cadillac Employee Health Plan (the "Plan"), a self-funded employee welfare benefit plan within the meaning of ERISA. *See* 29 U.S.C. § 1002(1) (2005). Benefit Concepts, Inc. ("Benefit Concepts") is the administrator of the Plan and, thus, is also a fiduciary within the meaning of ERISA. *See* 29 U.S.C. § 1002(16)(A), (21)(A) (2005). One of the Plan's provisions, the Subrogation Clause, provides, "Upon the payment of benefits under this Plan, the Company[4] shall be subrogated to all of the Benefit Recipient's rights of recovery of those benefits against any person or organization." *See* Pl.'s Mem. Ex. A, at 23 (footnote added).

Facing substantial medical bills as a result of the accident, Macera quickly exhausted the $10,000 personal injury benefit available under her automobile insurance policy. When she continued to incur medical expenses, she directed her medical providers to submit their bills to the Plan for payment.

On behalf of the Plan, Strategic Recovery Partnership, Inc. ("Strategic Recovery"), the subrogation agent for Benefit Concepts, notified Macera's attorney that it would not pay the bills until she signed a standard Subrogation Agreement. Had she executed this Agreement in its unaltered form, Macera would have agreed to abide by the Plan's Subrogation Clause "in consideration of payment of benefits for medical expenses resulting [from her] accident of 06/14/99." Rather than simply

moving party is entitled to judgment as a matter of law. Fed.R.Civ.P. 56(c). In ruling on a motion for summary judgment, the Court must view the evidence, and make all reasonable inferences from the evidence, in the light most favorable to the nonmoving party. *Anderson v. Liberty Lobby, Inc.*, 477 U.S. 242, 252, 106 S.Ct. 2505, 91 L.Ed.2d 202 (1986). The moving party bears the initial burden of proving that there is no genuine issue of material fact in dispute. *Matsushita Elec. Indus. Co. Ltd. v. Zenith Radio Corp.*, 475 U.S. 574, 585 n. 10, 106 S.Ct. 1348, 89 L.Ed.2d 538 (1986). Once the moving party carries this burden, the nonmoving party must "come forward with 'specific facts showing there is a genuine issue for trial.'" *Id.* at 587, 106 S.Ct. 1348 (quoting Fed.R.Civ.P. 56(e)). The task for the Court is to inquire "whether the evidence presents a sufficient disagreement to require submission to the jury or whether it is so one-sided that one party must prevail as a matter of law." *Liberty Lobby*, 477 U.S. at 251–52, 106 S.Ct. 2505; *Tabas v. Tabas*, 47 F.3d 1280, 1287 (3d Cir.1995) (en banc).

2. The following recitation is based upon the undisputed record we have distilled from the parties' submissions. Since this enterprise was not without some uncertainty, in an abundance of caution, we shared with the parties our understanding of what seemed not to be in controversy. *See* Order of June 1, 2005 (docket entry # 42). Having discerned from the parties' responses that our distillation was correct in all material respects, *see* Order of June 3, 2005 and the attachments on file with it (docket entry # 43), we may base our decision upon it. *See* Fed.R.Civ.P. 56(c).

3. Individuals other than Dade and insurance companies other than Allstate may have been involved in the April 1, 1997 accident, but the record does not explain how they are involved. Regardless, the legal issues that we address in this Memorandum do not depend on the precise identities, or the precise number, of parties involved in the accident.

4. The Plan defines the "Company" as "Don Rosen Cadillac," Macera's employer.

sign the form, however, Macera corrected the date to reflect that her accident actually occurred on "04/01/97" and added a hand-written limitation on Don Rosen Cadillac's subrogation rights. Specifically, she recognized its claim only "to the extent allowed by Act VI[5] and all other laws regarding payment of reasonable expenses." After making these changes, Macera signed the altered form on July 22, 1999. *See* Pl.'s Mem. Ex. D.

The Plan paid at least $19,028.94 to Macera's medical providers. *See* Second Am. Compl. ¶¶ 33, 37 (demanding $19,028.94); *see also* Pl.'s Mem. Ex. F (listing $19,809.88 in payments); Second Am. Compl. ¶ 16 (alleging that the Plan paid $30,396.75). Because Macera had a pre-existing condition, the parties do not agree on what amount the Plan paid for treatment of injuries that she sustained in the April 1, 1997 accident.

While she was undergoing medical treatment, Macera filed a negligence action against Dade in the Philadelphia County Court of Common Pleas. On December 1, 1999, just as jury selection was about to begin in that case, Allstate (and another insurance company) settled the claims arising out of the April 1, 1997 accident for $60,000.00. *See* Pl.'s Mem. Ex. I.

Even before it learned the precise terms of the settlement, Strategic Recovery demanded that Macera reimburse Don Rosen Cadillac for the medical expenses that the Plan had paid on her behalf. Years passed without the parties reaching any agreement as to the amount that Macera would pay, and eventually Benefit Concepts brought this lawsuit to enforce its rights under the Subrogation Clause (Count I) and the Subrogation Agreement (Count II). Macera asserted a counterclaim alleging that Benefit Concepts breached its fiduciary duties to her by overpaying her medical providers. Both parties have filed motions requesting that we enter summary judgment in their favor on all claims.

*Legal Analysis*

We focus on Macera's counterclaim because it encapsulates the parties' fundamental dispute. Though her medical providers may have submitted bills for $19,028.94, Macera argues that 75 Pa. Cons.Stat. Ann. § 1797(a)[6] required Benefit Concepts not to pay the full amount of the bills. Thus, she contends that Benefit Concepts breached its fiduciary duties to her when it paid the bills in full. Benefit Concepts contends that Section 1797(a) does not apply to the Plan and that, even if it did, ERISA would preempt it. Since Benefit Concepts would be entitled to summary judgment if Section 1797(a) did not apply to the Plan, Macera's counterclaim can survive only if ERISA does not

---

**5.** "Act 6" commonly refers to Pennsylvania's Motor Vehicle Financial Responsibility Law ("MVFRL"), 75 Pa. Cons.Stat. Ann. §§ 1701–1799.7 (2005). Though it was originally enacted in 1984, *see* Act of Feb. 12, 1984 (P.L. 26, No. 11), the MVFRL came to be known as "Act 6" after it was substantially amended in 1990, *see* Act of Feb. 7, 1990 (P.L. 11, No. 6) [hereinafter "Act 6"]. Among other things, Section 18 of Act 6 added a new Section 1797 to Title 75 of Pennsylvania's Consolidated Statutes. *See id.* at 35–37.

**6.** In relevant part, Section 1797(a) provides that:

> A person or institution providing treatment, accommodations, products or services to an injured person for an injury covered by liability or uninsured and underinsured benefits or first party medical benefits, including extraordinary medical benefits, for a motor vehicle ... shall not require, request or accept payment for the treatment, accommodations, products or services in excess of [statutorily specified amounts].

75 Pa. Cons.Stat. Ann. § 1797(a) (2005).

preempt Section 1797(a) as it applies to the Plan.

■ ERISA contains a sweeping preemption clause designed to "supersede any and all State laws insofar as they may now or hereafter relate to any employee benefit plan." 29 U.S.C. § 1144(a) (2005). This provision is "deliberately expansive, and designed to 'establish pension plan regulation as exclusively a federal concern.'" *Pilot Life Ins. Co. v. Dedeaux,* 481 U.S. 41, 46, 107 S.Ct. 1549, 1552, 95 L.Ed.2d 39 (1987) (quoting *Alessi v. Raybestos–Manhattan, Inc.,* 451 U.S. 504, 523, 101 S.Ct. 1895, 1906, 68 L.Ed.2d 402 (1981)). Because of this expansiveness, the Supreme Court has given "the phrase 'relate to' ... its broad common-sense meaning, such that a state law 'relate[s] to' a benefit plan in the normal sense of the phrase, if it has a connection with or reference to such a plan." *Metropolitan Life Ins. Co. v. Massachusetts,* 471 U.S. 724, 739, 105 S.Ct. 2380, 2389, 85 L.Ed.2d 728 (1985) (some internal quotations and citation omitted). Thus, "a state law may 'relate to' a benefit plan, and thereby be pre-empted, even if the law is not specifically designed to affect such plans, or the effect is only indirect." *Ingersoll–Rand Co. v. McClendon,* 498 U.S. 133, 139, 111 S.Ct. 478, 483, 112 L.Ed.2d 474 (1990).

Although Section 1797(a) does not explicitly refer to employee benefit plans, we presume that it "has a connection with" those plans. *See Metropolitan Life,* 471 U.S. at 739, 105 S.Ct. at 2389. After all, if no such connection exists, Macera could not argue in good faith that Section 1797(a) limits the amounts that the Plan should have paid to her medical providers. Whatever this connection may be, it is enough for us to presume that Section 1797(a) "relate[s] to" employee benefit plans within the meaning of 29 U.S.C. § 1144(a).

Because ERISA's preemption clause encompasses Section 1797(a), we must consider whether the statute also falls within ERISA's saving clause, which exempts "any law of any State which regulates insurance, banking or securities" from preemption. 29 U.S.C. § 1144(b)(2)(A) (2005). On its face, Section 1797(a) does not regulate banking or securities, so we concentrate on whether it "regulates insurance."

■ In *Kentucky Ass'n of Health Plans v. Miller,* 538 U.S. 329, 341–42, 123 S.Ct. 1471, 1479, 155 L.Ed.2d 468 (2003), the Supreme Court made a "clean break" with its prior precedent interpreting ERISA's saving clause and announced a refined two-part test. For a state law to "regulate[] insurance," and thus be saved from preemption, it must (1) "be specifically directed toward entities engaged in insurance"; and (2) "substantially affect the risk pooling arrangement between the insurer and the insured." *Id.*

Section 1797(a) is specifically directed toward the insurance industry. Enacted "to reduce the rising cost of purchasing motor vehicle insurance," *Pittsburgh Neurosurgery Assocs., Inc. v. Danner,* 733 A.2d 1279, 1282 (1999), it authorizes insurance companies to pay less than medical providers' customary charges if those charges exceed statutorily defined thresholds. Although the phrasing of Section 1797(a) purports to regulate only medical providers, it directly benefits insurers by limiting the amounts that they must pay, precisely as the General Assembly intended.

For similar reasons, Section 1797(a) also substantially affects the risk pooling arrangement between insurers and their insureds. By limiting the rates that medical providers can charge insurers, Section

1797(a) reduces insurers' actuarial risk [7] thereby permitting them to past the cost savings onto insureds. To be sure, the effect is indirect, but even statutes with indirect effects on risk pooling arrangements have been found to "regulate[ ] insurance." *See, e.g., Miller*, 538 U.S. at 339, 123 S.Ct. at 1478 (explaining that a Kentucky law prohibiting health insurers from discriminating against medical providers substantially affected the risk pooling arrangement because it prevented consumers from "seek[ing] insurance from a closed network of health-care providers in exchange for a lower premium").

Since Section 1797(a) is specifically directed toward insurance companies and substantially affects the risk pooling arrangement between insurers and their insureds, we hold that it "regulates insurance," within the meaning of 29 U.S.C. § 1144(b)(2)(A). Indeed, the parties do not seriously dispute that Section 1797(a) regulates insurance. *See* Pl.'s Resp. at 4–5 ("[a]ssuming ... that Act VI does in fact regulate insurance" without ever arguing the contrary position); *see also* Def.'s Mem. at 3–6 (contending that "Act 6 regulates insurance").

■ Even though it regulates insurance, Section 1797(a) ERISA's deemer clause prevents it from being applied to the Plan. The deemer clause provides that "[n]either an employee benefit plan ..., nor any trust established under such a plan, shall be deemed to be an insurance company or other insurer ... or to be engaged in the business of insurance ... for purposes of any law of any State purporting to regulate insurance companies [or] insurance

contracts." 29 U.S.C. § 1144(b)(2)(B) (2005). By preventing states from applying their general insurance regulations to employee benefit plans, the deemer clause "relieves plans from state laws 'purporting to regulate insurance.'" *FMC Corp. v. Holliday*, 498 U.S. 52, 61, 111 S.Ct. 403, 409, 112 L.Ed.2d 356 (1990). Thus, even if a law "regulates insurance" within the meaning of the saving clause, the deemer clause prevents parties from applying that law to self-funded employee benefit plans. *See also id.* ("State laws that directly regulate insurance are 'saved' but do not reach self-funded employee benefit plans because the plans may not be deemed to be insurance companies ... for purposes of such state laws."). Since the Plan is a self-funded employee benefit plan, the deemer clause forecloses any possibility that Section 1797(a) could apply to it.[8]

Macera claims that construing ERISA to preempt Section 1797(a)'s application to the Plan would put her in an untenable position. She believes that the state judge presiding over her case against Dade would have precluded her from introducing at that trial evidence of the full amount that the Plan paid on her behalf because that judge believed that Act 6 precluded her from recovering more than the capped amount. Facing this potentially adverse ruling, Macera settled her claim against Dade based on the assumption that she could recover no more than the capped amount. To require her to reimburse the Plan for the full amount would, in Macera's view, violate the principle that "a subrogee's rights can rise no higher than that [*sic* ] of its subrogor." *Hagans v. Consti-*

---

7. *See Barber v. Unum Life Ins. Co.*, 383 F.3d 134, 143 (3d Cir.2004) (explaining that "[w]ithin the insurance industry, 'risk' means the risk of ... loss for which the insurer contractually agrees to compensate the insured").

8. To the extent that Section 1797(a) regulates entities other than self-funded employee benefit plans, such as automobile insurance companies, the deemer clause does not apply, and ERISA does not preempt the application of Section 1797(a) to those entities.

*tution State Serv. Co.,* 455 Pa.Super. 231, 687 A.2d 1145, 1154 (1997).

This argument has several flaws. First, it depends on a wholly speculative assumption about how the state judge might have ruled. Second, even if the judge had made the ruling that Macera believes he or she would have made, that ruling would have been in error because ERISA preempts § 1797(a) to the extent it may have otherwise applied to the Plan. In other words, Act 6 does *not* preclude Macera from recovering more than the capped amount, notwithstanding what the state judge may have believed. Had the judge actually ruled, Macera could have appealed the ruling. Her decision to compromise her claim against Dade, of course, foreclosed that possibility, but we perceive no unfairness in holding her responsible for the consequences of her strategic choices. Finally, our holding does not permit the Plan's rights to "rise higher" than Macera's rights. Macera received $60,000, and the Plan seeks less than $20,000.

*Conclusion*

To sum up, Section 1797(a) regulates insurance. ERISA ordinarily does not preempt state insurance regulation, but the deemer clause prevents state laws that regulate insurance generally from being applied to self-funded employee benefit plans. Thus, ERISA preempts Section 1797(a) to the extent that it attempts to regulate the Plan. Since Section 1797(a) cannot regulate the Plan, Benefit Concepts could not have violated any fiduciary duty by failing to comply with it. Benefit Concepts is therefore entitled to summary judgment on Macera's counterclaim.

Benefit Concepts has demonstrated that Macera failed to comply with the Plan's Subrogation Clause, so we shall also grant its motion for summary judgment on Count I. Similarly, we shall grant the motion with respect to Count II because the uncontroverted record evidence shows that Macera breached the Subrogation Agreement.[9] Though we shall grant the motion, we cannot yet enter judgment against Macera because Benefit Concepts has not proven the precise amount to which it is entitled.

An appropriate Order follows.

### ORDER

AND NOW, this 6th day of June, 2005, upon consideration of plaintiff's motion for summary judgment (docket entry # 38), defendant's response thereto, defendant's motion for summary judgment (docket entry # 39), plaintiff's response thereto, and the parties' epistolary responses to our Order of June 1, 2005, and in accordance with the accompanying Memorandum, it is hereby ORDERED that:

1. Plaintiff's motion for summary judgment is GRANTED IN PART;

2. Defendant's motion for summary judgment is DENIED; and

3. By June 9, 2005, the parties each shall REPORT BY FAX (215–580–2156) whether they would prefer: (i) a non-jury trial as to the dollar amount of what plaintiff owes defendant; or (ii) arbitration of that narrow issue pursuant to Loc. R. Civ. P. 53.2.

---

**9.** Macera's hand-written notation on the Subrogation Agreement does not limit Benefit Concepts's rights because the notation limits those rights "to the extent allowed by Act VI." Since ERISA preempts Section 1797(a), Act 6 has no effect on Benefit Concepts's rights.