Steven THOMPKINS and Amy Thompkins, Plaintiffs,

v.

BC LIFE AND HEALTH INSURANCE COMPANY, et al., Defendants.

No. CV04–08294FMCRZX.

United States District Court, C.D. California.

Jan. 4, 2006.

Glenn R. Kantor, Lisa S. Kantor, Kantor and Kantor, Northridge, CA, for Plaintiffs.

Brian F. Rowe, BC Life & Health Insurance Company, Woodland Hills, CA, for Defendants.

## ORDER ON ADMINISTRATIVE REVIEW

COOPER, District Judge.

This matter is before the Court on administrative review. The Court has reviewed the parties' briefs and the administrative record. As explained herein, the Court reviews the administrative decision *de novo* and concludes that Plaintiff is entitled to benefits under the Plan.

### I. Background

This action arises out of a dispute over entitlement to benefits under a policy of insurance governed by the Employee Retirement Income Security Act, 29 U.S.C. §§ 1001—1461 ("ERISA"). The parties dispute what law governs regarding the level of benefits that must be provided for psychological conditions such as that suffered by Plaintiff Amy Thompkins. The parties also dispute the relevant standard of review. Ultimately, the Court concludes that California's parity law applies and that the relevant standard of review is *de novo*. Employing the *de novo* standard of review, the Court concludes that Plaintiff is entitled to benefits under the Plan.

### II. Consideration of Additional Evidence

Upon *de novo* administrative review in an ERISA case, a district court

may consider evidence not in the administrative record where such evidence will "enable [the court to] exercise … informed and independent judgment." *Mongeluzo v. Baxter Travenol Long Term Disability Ben. Plan*, 46 F.3d 938, 943 (9th Cir.1995); *accord Kearney v. Standard Ins. Co.*, 175 F.3d 1084, 1095 (9th Cir. 1999); *Jebian v. Hewlett–Packard Co. Employee Benefits Organization Income Protection Plan*, 349 F.3d 1098, 1110 (9th Cir. 2003). At issue here is Plaintiff's continuing entitlement to benefits after August 29, 2005. There is a dearth of evidence in the record of the medical necessity of Plaintiff's inpatient treatment after that date. Accordingly, the Court considers the report of an examining doctor, Moisy Shopper, M.D., dated November 10, 2004.

## III. Factual Background

Plaintiff suffers from dissociative disorder and bulimia. She has been hospitalized several times for these disorders. At issue in the present action is Plaintiff's inpatient treatment at Castlewood Treatment Center from mid-May 2004 to November 1, 2004.

Plaintiff's policy provides for the following benefits:[1] The policy pays 80% to participating providers and 60% to non-participating providers, subject to a $500 calendar-year deductible, a $500 inpatient deductible, and a $500 non-certification deductible. The annual out-of-pocket maximum expenditure for each beneficiary is $1,000 when paid to participating providers, and $6,000 when paid to non-participating providers.

On August 27, 2004, Defendant approved Plaintiff's inpatient treatment from May 11, 2004, through August 29, 2004.[2] AR at BC 00410. Claims for this time period were paid,[3] except for a $500 penalty for failure to obtain pre-authorization and the $6,000 amount that represents the annual maximum out-of-pocket expenditure under the policy per beneficiary.

On September 3, 2004, Defendant denied certification of inpatient treatment after August 29, 2004. AR at BC 00417. In its

---

1. As discussed more fully below, the policy's more restrictive provisions regarding treatment for mental conditions do not apply in light of California's mental health care parity law.

2. The provision of benefits for Plaintiff's inpatient treatment from May 11 to August 29 was the subject of much correspondence and other communication between Plaintiff's family and Defendant. Ultimately, Defendant paid benefits for this time period.

3. Although Castlewood is a non-contracting provider, Defendant voluntarily agreed to pay, and in fact did pay, the higher 80% rate rather than the lower 60% rate for the time period May 11 through August 29 "due to various misunderstandings in quoting the benefits." AR at BC00168. Defendant now argues that, should the Court award benefits for the time period after August 29, the Court should credit this overpayment to amounts due for the time period after August 29. From an examination of the administrative

record, it is clear that the parties dispute entitlement to benefits only after August 29, 2004. *See* AR at 410 (approval of benefits for inpatient treatment May 11 through August 29, 2004); *compare* Defendant's Ex. R *with* Plaintiff's Ex. E (Defendant's payments of $91,500 equal amounts charged by Castlewood for May 11 through August 29 less $6,000 out-of-pocket maximum and $500 penalty for failure to obtain pre-certification). Therefore, Plaintiff's claim for benefits is limited to the period after August 29, 2004. Because Plaintiff's claim for benefits does not in substance encompass the time period May 11 through August 29, 2004, the Court does not disturb the settled expectations of the parties regarding the benefits already paid and instead examines entitlement to benefits for the time period August 30 through November 1.

In any event, because Plaintiff has met the out-of-pocket maximum expenditure for 2004, it does not appear to the Court that the amount of benefits to be awarded would change even if the Court were to accept Defendant's argument.

denial letter, Defendant stated that Plaintiff no longer met the treatment criteria for inpatient treatment of an eating disorder. Defendant noted that Plaintiff showed some fluctuation in mood, but her mood was generally fair to good. Defendant also noted that Plaintiff's daily level of functioning was considered adequate for outpatient treatment; she was not binging and there was only infrequent purging. Defendant stated that Plaintiff did not require 24–hour monitoring for excessive exercising, purging, or eating, and noted that Plaintiff's weight was stable.

On September 7, 2004, Plaintiff's "primary therapist" responded to Defendant's assessment. AR at BC 00434. Dr. Lipsitz (licensed psychologist) stated that Plaintiff came to Castlewood after several inpatient admissions at other facilities for either her eating disorder or for her trauma issues. He reported that she would work on each of these two areas independently and subsequently the other problem would worsen. Plaintiff's treatment at Castlewood focused on both issues. Dr. Lipsitz noted that Plaintiff was dealing with multiple past incidences of severe physical, emotional, and sexual trauma over a several-year period. She had been diagnosed with dissociative identity disorder, post-traumatic stress disorder, and an eating disorder. Her symptoms have included profound depression, flashbacks, dissociation into altered personalities, loss of consciousness, binging and purging, and hiding food. Dr. Lipsitz reported that Plaintiff's eating disorder caused esophageal tears and damage, which were life threatening. Dr. Lipsitz offered the perspective that although Plaintiff had made strides in her treatment, she was "still at grave risk to relapse into severe depression and regress into child-like behavior." In his opinion, to transfer her from inpatient treatment "would create an extremely dangerous situation for her."

On September 10, 2004, Defendant responded to a complaint filed on behalf of Plaintiff with the California Department of Insurance regarding the failure to approve benefits beginning on August 30, 2004. AR at BC 00477. Defendant reported the following:

According to Plaintiff's attending psychiatrist, Plaintiff had diagnoses of major depression (recurrent), dissociative identity disorder, post-traumatic stress disorder, and bulimia. Plaintiff's mood was "fairly good" upon increase in medications; she was not suicidal. There were brief periods of dissociating to a frightened child-like state and withdrawing. Her eating fluctuated a great deal during the week from normal to restricting to purging. There were no present medical problems or abnormal lab tests.

According to Defendant's review of the Castlewood medical records, "patient had some trouble with eating, but her weight was generally stable." No purging or binging was documented. She had trouble finishing meals when upset. She went on two day passes with her family; no problems were reported. Her mood was reported as good; no self-abusive or risk-taking behavior was documented. Her level of functioning appeared good. Her family was supportive.

From this, Defendant's medical reviewer concluded that Plaintiff "no longer met residential treatment criteria for either an eating disorder or other psychiatric disorder" and recommended "[a]n intensive outpatient program."

Several of Plaintiff's treatment team provided information to the Department of Insurance as well:

Deborah Hinds, a nutritionist, on September 9, 2004, reported that it seemed that Plaintiff's "trauma issues" were "intertwined" with her eating disorder. AR

at BC00520. Ms. Hinds reported that Plaintiff restricted food such that she need a nasogastric tube for supplemental nutrition. Ms. Hinds also reported Plaintiff would purge and hide food. Ms. Hinds reported that over the preceding five days, Plaintiff had purged three times, restricted at meals, and attempted to hide food. Ms. Hinds recommended continued inpatient care.

Dr. Miller, Castlewood's medical director, on September 8, 2004, had the following comments and conclusions:

little progress had been made in Plaintiff's previous inpatient treatment because each hospitalization focused on either the trauma issues or the eating disorder;

Plaintiff had been referred to Castlewood because of its expertise in dealing with both issues simultaneously;

other cases similar to Plaintiff's have shown that a "history of trauma intertwines deeply with the psychological issues involved in her eating disorder";

the underlying trauma must be identified and resolved before significant improvement can occur in eating disorder;

it was inadvisable to change Plaintiff's treatment because of the trust established with her current treatment team;

Plaintiff's "behavior here has not indicated evidence of remission, even in this controlled setting";

significant monitoring was necessary to ensure that Plaintiff has adequate nutritional intake; and

continued inpatient treatment was recommended. AR at BC 00522.

Defendant's response to the reports from Plaintiff's treatment team focus on the two doctors' agreement that Plaintiff had made progress and on the fact that the severe problems experienced by Plaintiff (e.g., needing a feeding tube) occurred well before the August 30, 2004, date that

Defendant stopped providing benefits for inpatient care. Defendant also criticized Castlewood's method of treatment for trauma, noting that by "encouraging [Plaintiff] to recall every trauma ... regression was promoted," and suggesting that a better approach was to "encourag[e] Plaintiff to build strength and skills to cope with ... destabilizing factors when they spontaneously emerge" in order to "help her remain stable in the face of them."

The California Department of Insurance upheld the denial of benefits.

In late September, prior authorization for inpatient treatment at Castlewood was sought following a relapse. Treatment notes from the week of September 13 were provided to Defendant. AR at BC00569. Those notes reflect "trauma work around details of cult-abuse events; purging several [times] per day; ... stopped eating or drinking Sat, Sun, Mond. Became dehydrated." Defendant reviewed this information and determined that Plaintiff's "stay at Castlewood has been uninterrupted, ... and that she remains at the level of care previously determined to be not medically necessary." AR at BC 00575. In the same letter, Defendant informed Castlewood that it would authorize a "Partial Hospital Program with concurrent review."

On November 10, 2004, Plaintiff was examined by Dr. Moisy Shopper. As a result of her examination and a review of Plaintiff's medical records, Dr. Shopper made the following observations and conclusions:

Amy Thompkins at this point in time is operating at a very regressed level. She is often withdrawn and introverted with the predominant affect [of] fright and distrust. Her world seems to be dichotomized into good and bad. She has unclear and varying boundaries between what is real and what is imagined,

what is dreamt and what is reality. This, together with her history of eating disturbances and history of sexual tramata leads me to diagnos[e] this patient as having a "borderline personality organization." This fluctuation in functioning may be quite marked even within the same morning or afternoon. As a result she is likely to offer pictures of herself that are quite variable and often disparate with one another.

... At this point I believe she still has the potential to be injurious to herself both through her anorexia as well as through her dissociated states. Within her current controlled environment I do not see her being a suicidal risk. However with this degree of identity diffusion, dissociation, and regression, it is very hard to predict future problems....

In any event precipitous discharge from the controlled environment of the Castlewood facility without an adequate step-down and termination plan is risky and potentially dangerous.

Plaintiff's Ex. B.

## IV. Standard of Review

■■■ A plan administrator is presumed to have no discretion to interpret the terms of an ERISA plan; therefore, the administrator bears the burden of showing that the plan unambiguously confers such discretion on the administrator. *Kearney v. Standard Ins. Co.*, 175 F.3d 1084, 1089 (9th Cir.1999) (*en banc*), *cert.*

*denied,* 528 U.S. 964, 120 S.Ct. 398, 145 L.Ed.2d 310 (1999). Where that burden is met, the administrator's denial of benefits is reviewed for abuse of discretion under the "arbitrary and capricious" standard of review. *Id.* Where the burden is not met, the Court reviews the administrator's decision *de novo.*

■■■ Defendant argues that language in the policy that confers on it the authority to determine whether a service is "medically necessary" is sufficient to meet this standard. *See* AR at 00009 ("The benefits of this certificate are provided only for services which we determine to be medically necessary.") However, the Ninth Circuit has rejected a similar argument. *See Simkins v. NevadaCare, Inc.*, 229 F.3d 729 (9th Cir.2000), *cert. denied,* 532 U.S. 957, 121 S.Ct. 1484, 149 L.Ed.2d 372 (2001) (rejecting an argument that an ERISA policy's definition of "medically necessary" conferred upon the administrator the discretion necessary to warrant the deferential arbitrary and capricious standard of review and noting that the "discretion to define medical policy and procedure is not the same as discretion to construe the terms of the Plan"). Accordingly, the Court will review the administrator's decision *de novo.*

## V. California Parity Law

■■■ The parties disagree as to whether the terms of the Plan are altered by California's mental health care parity law,[4]

---

4. The parties do not discuss whether the California mental health care parity law is preempted by ERISA. The Court concludes that it is not.

Generally, ERISA preempts all laws that "relate to" an employee benefit plan. 29 U.S.C. § 1144(a). However, a state law that ordinarily would be preempted by ERISA may be "saved" from preemption if it is a "law ... which regulates insurance." 29 U.S.C. § 1144(b)(2)(A). To be considered a law that regulates insurance, the law must

1) be "specifically directed toward entities engaged in insurance," and 2) "must substantially affect the risk pooling arrangement between the insurer and the insured." *Kentucky Ass'n of Health Plans, Inc. v. Miller,* 538 U.S. 329, 341–342, 123 S.Ct. 1471, 155 L.Ed.2d 468 (2003). Laws that dictate the terms that insurance policies must contain are "laws ... which regulate insurance" and are therefore not preempted by ERISA. *See id.* at 338, 123 S.Ct. 1471 ("We have never held that state laws must alter or control the

which requires health insurance policies to cover treatment for mental illness on the same terms and conditions applied to other medical conditions. Cal. Ins.Code § 10144.5. Specifically, § 10144.5 provides:

(a) Every policy of disability insurance that covers hospital, medical, or surgical expenses in this state that is issued, amended, or renewed on or after July 1, 2000, shall provide coverage for the diagnosis and medically necessary treatment of severe mental illnesses of a person of any age, and of serious emotional disturbances of a child, as specified in subdivisions (d) and (e), under the same terms and conditions applied to other medical conditions, as specified in subdivision (c).

(b) These benefits shall include the following:

(1) Outpatient services.

(2) Inpatient hospital services.

(3) Partial hospital services.

(4) Prescription drugs, if the policy or contract includes coverage for prescription drugs.

(c) The terms and conditions applied to the benefits required by this section that shall be applied equally to all benefits under the disability insurance policy shall include, but not be limited to, the following:

(1) Maximum lifetime benefits.

(2) Copayments and coinsurance.

(3) Individual and family deductibles.

(d) For the purposes of this section, "severe mental illnesses" shall include:

(1) Schizophrenia.

(2) Schizoaffective disorder.

(3) Bipolar disorder (manic-depressive illness).

(4) Major depressive disorders.

(5) Panic disorder.

(6) Obsessive-compulsive disorder.

(7) Pervasive developmental disorder or autism.

(8) Anorexia nervosa.

(9) Bulimia nervosa.

*Id.*

■ Defendant argues that the "plain meaning" of this statute shows "that it applies to policies written to cover expenses incurred in this state." Resp. Br. at 6. The Court agrees that this is a reasonable interpretation of this statute.[5] However, Defendant's argument ignores that the policy at issue—a master policy issued by it in California—is in fact a "polic[y] written to cover expenses incurred in this state." From a review of the policy, and Defendant's statements in its briefs, it becomes clear that the master policy was written in such a way as to provide benefits to California beneficiaries, some of whom, it can safely be assumed, would most assuredly seek medical care within the state. *See* Def.'s Opening Br. at 2 ("The Plan is funded by a master policy of insurance issued in California by BC Life to Howroyd."); Def.'s Resp. Br. at 6 ("Amy Thompkins' insurance policy was issued to her husband's employer in California. However, the coverage it provides to non-Californians is different."); AR at 00003 (referring beneficiaries with complaints or questions that are not resolved to the California Department of Insurance); AR at 00077 (explaining rights to

---

actual terms of insurance policies to be deemed "laws ... which regulat[e] insurance" under § 1144(b)(2)(A); it suffices that they substantially affect the risk pooling arrangement between insurer and insured.").

**5.** The Court notes, however, that this is not necessarily the *only* reasonable interpretation of this statute. Nevertheless, the Court's analysis today does not require an exhaustive discussion of other possible interpretations of § 10144.5.

CalCOBRA continuation coverage, Cal. Ins.Code § 10128.50—10128.59).

The fallacy of Defendant's argument is that § 10144.5 does not limit application of the parity law on the basis of where the *individual beneficiaries* live or seek medical care; rather, the statute addresses *policies* to which the parity law applies. Viewed in this light, the conclusion that the California mental-health parity law applies to the policy at issue is inescapable.

In order to find that California's parity law does not apply to the policy at issue, the Court would have accept a slightly different version of Defendant's argument. The Court would have to hold that § 10144.5 applies to policies that cover *only* services provided in the state or that provide benefits to *only* California beneficiaries. Section 10144.5 is not susceptible to such an interpretation.

Therefore, the Court applies California's mental health care parity law to the policy at issue in this action.

### VI. Entitlement to Benefits

■ Here, upon *de novo* review, it is clear to the Court that Plaintiff is entitled to benefits under the Plan for her inpatient treatment August 30 through November 1, 2004. The most recent medical evidence, gathered a month after this time period, reveals that Plaintiff was regressed and withdrawn. She had unclear boundaries regarding reality and imagination. The examining doctor expressed the belief that Plaintiff had the potential to be injurious to herself and recommended that discharge from the controlled environment of Castlewood occur only under supervision in a "step-down program."

Medical notes from the week of September 13 show that Plaintiff was purging and that she failed to eat or drink for three days. Plaintiff was scheduled to be started on a feeding tube, but that did not occur only because Plaintiff was able to start drinking after a therapy session.

Defendant's criticism of Castlewood's preferred method of treatment is unconvincing. Defendant's medical reviewers suggest that the trauma treatment techniques of recalling and resolving past trauma should be discontinued in light of the adverse effect therapy sessions appeared to have on Plaintiff's eating habits. However, Defendant's medical reviewers do not comment on Plaintiff's treatment team's comments regarding the importance of addressing both Plaintiff's eating disorder and the underlying trauma. Her treatment team document an extensive history of ineffective treatment that focused on either the trauma or the eating disorder rather than on both.

All of Plaintiff's treating doctors recommended continued inpatient treatment after August 29. No medical evidence suggests that such inpatient treatment was not medically necessary. Therefore, Plaintiff is entitled to benefits under the Plan for August 29 through November 1, 2004.

Plaintiff has met the annual out-of-pocket maximum expenditure for 2004 of $6,000 to a non-participating provider. Therefore, her benefits for this time period are to be paid at 100%. The amount billed for this time period are $59,150. *See* Plaintiff's Ex. E; Defendant's Ex. R (total billed of $157,150, less amount paid by Defendant of $91,500, less out-of-pocket maximum of $6,000, less failure to pre-certify penalty of $500, equals benefits due of $59,150).

### VII. Conclusion

Upon administrative review, the Court determines that Plaintiff is entitled to benefits under the Plan in the amount of $59,150.

Plaintiff shall prepare and lodge a proposed judgment, consistent with this Or-

der, within ten days of the entry of this Order.