# FOR PUBLICATION

# UNITED STATES COURT OF APPEALS
# FOR THE NINTH CIRCUIT

STANDARD INSURANCE COMPANY,
          *Plaintiff-Appellant,*

          v.

JOHN MORRISON, State Auditor, ex
officio Commissioner of
Insurance,
          *Defendant-Appellee.*

No. 08-35246

D.C. No.
06-CV-00047-DWM

OPINION

Appeal from the United States District Court
for the District of Montana
Donald W. Molloy, District Judge, Presiding

Argued and Submitted
June 3, 2009—Portland, Oregon

Filed October 27, 2009

Before: Alfred T. Goodwin, Diarmuid F. O'Scannlain, and
Raymond C. Fisher, Circuit Judges.

Opinion by Judge O'Scannlain

14365

## COUNSEL

Meir Feder, Jones Day, LLP, New York, New York, argued the cause for the plaintiff-appellant and filed the briefs. Phineas E. Leahey, Shawn Hanson, Katherine Ritchey, and Lara Kollios were also on the briefs.

James G. Hunt, Hunt Law Firm, Helena, Montana, argued the cause for the defendant-appellee and filed the briefs.

Jeremiah J. Morgan, Bryan Cave, LLP, Kansas City, Missouri, filed a brief on behalf of amici curiae National Association of Insurance Commissioners.

Mary Ellen Signorille, AARP Foundation Litigation, Washington, DC, filed a brief on behalf of amici curiae AARP. Melvin R. Radowitz, AARP, was also on the brief.

## OPINION

O'SCANNLAIN, Circuit Judge:

We must decide whether a state's practice of disapproving insurance policies with clauses vesting discretion in insurers

runs afoul of the Employee Retirement Income Security Act of 1974.

I

A

Montana requires its commissioner of insurance to "disapprove any [insurance] form . . . if the form . . . contains . . . any inconsistent, ambiguous, or misleading clauses or exceptions and conditions which deceptively affect the risk purported to be assumed in the general coverage of the contract . . . ." Mont. Code Ann. § 33-1-502. John Morrison, who is commissioner by virtue of being state auditor, has announced that this statute requires him to disapprove any insurance contract containing a so-called "discretionary clause." He has consistently disapproved such policy forms. We will call this his "practice," as there is no specific Montana law forbidding discretionary clauses.

Under the Employee Retirement Income Security Act of 1974 ("ERISA"), insureds who believe they have been wrongfully denied benefits may sue in federal court. The court determines the standard of review by checking for the presence of a discretionary clause. Such a clause might read: "Insurer has full discretion and authority to determine the benefits and amounts payable [as well as] to construe and interpret all terms and provisions of the plan." If an insurance contract has a discretionary clause, the decisions of the insurance company are reviewed under an abuse of discretion standard. Absent a discretionary clause, review is de novo. *Firestone Tire & Rubber Co. v. Bruch*, 489 U.S. 101, 111 (1989).

Discretionary clauses are controversial. The National Association of Insurance Commissioners ("NAIC") opposes their use, arguing that a ban on such clauses would mitigate the conflict of interest present when the claims adjudicator also

pays the benefit. The use of discretionary clauses, according to NAIC, may result in insurers engaging in inappropriate claim practices and relying on the discretionary clause as a shield. *See also* John H. Langbein, *Trust Law as Regulatory Law: The Unum/Provident Scandal and Judicial Review of Benefit Denials under ERISA*, 101 Nw. U. L. Rev. 1315, 1316 (2007) ("As regards Unum's ERISA-governed policies, Unum's program of bad faith benefit denials was all but invited by an ill-considered passage in . . . *Firestone Tire* . . . which allows ERISA plan sponsors to impose self-serving terms that severely restrict the ability of a reviewing court to correct a wrongful benefit denial."). According to NAIC, as of 2008, a dozen states had limited or barred the use of discretionary clauses in at least some form of insurance.

Insurers and other supporters of discretionary clauses argue they keep insurance costs manageable. They assert that more cases will be filed in the absence of a discretionary clause and that the wide ranging nature of de novo review will lead to increased per-case costs as well. Failure to control litigation costs, they suggest, will discourage employers from offering employee benefit programs in the first place. *See*, *e.g., Metro. Life Ins. Co. v. Glenn*, 128 S. Ct. 2343, 2353 (2008) (Roberts, C.J., concurring in part and concurring in the judgment) ("Ensuring that reviewing courts respect the discretionary authority conferred on ERISA fiduciaries encourages employers to provide medical and retirement benefits to their employees through ERISA-governed plans—something they are not required to do.").

Standard Insurance Company ("Standard") duly applied to Morrison for approval of its proposed disability insurance forms which contained discretionary clauses; Morrison denied the request. Standard responded by suing in district court, arguing that the subject is preempted by ERISA. The district court granted the Commissioner summary judgment, and Standard timely appeals.

B

**[1]** With certain exceptions, ERISA preempts "any and all State laws insofar as they may now or hereafter relate to any [covered] employee benefit plan." 29 U.S.C. § 1144(a). Relevant here, the so-called savings clause saves from preemption "any law of any State which regulates insurance, banking, or securities." *Id.* § 1144(b)(2)(A). Thus, while ERISA has broad preemptive force, its "saving clause then reclaims a substantial amount of ground." *Rush Prudential HMO, Inc. v. Moran*, 536 U.S. 355, 364 (2002). As the Supreme Court has stated, the tension between the broad preemption and the savings clause is marked:

> The unhelpful drafting of these antiphonal clauses occupies a substantial share of this Court's time. In trying to extrapolate congressional intent in a case like this, when congressional language seems simultaneously to preempt everything and hardly anything, we have no choice but to temper the assumption that the ordinary meaning . . . accurately expresses the legislative purpose with the qualification that the historic police powers of the States were not [meant] to be superseded by the Federal Act unless that was the clear and manifest purpose of Congress.

*Id.* at 364-65 (internal quotation marks and citations omitted).

Federal courts have interpreted ERISA as directing them to make substantive law as well. *See Firestone Tire*, 489 U.S. at 110 ("[C]ourts are to develop a federal common law of rights and obligations under ERISA-regulated plans." (internal quotation marks omitted)). In doing so, "we are guided by principles of trust law." *Id.* at 111.

II

**[2]** Is Commissioner Morrison's practice of denying approval to insurance forms with discretionary clauses pre-

empted by ERISA? Here, no one disputes that Commissioner Morrison's practice "relate[s] to any [covered] employee benefit plan." 29 U.S.C. § 1144(a). It is thus preempted unless preserved by the savings clause. To fall under the savings clause, a regulation must satisfy a two-part test laid out in *Kentucky Ass'n of Health Plans, Inc. v. Miller*, 538 U.S. 329, 342 (2003). "First, the state law must be specifically directed toward entities engaged in insurance." *Id.* Also, it "must substantially affect the risk pooling arrangement between the insurer and the insured." *Id.* We now turn to those two prongs.

## A

### 1

[3] Standard asserts initially that Morrison's practice of disapproving discretionary clauses is not specifically directed at insurance companies because it is instead directed at ERISA plans and procedures. Unfortunately for Standard, ERISA plans are a form of insurance, and the practice regulates insurance companies by limiting what they can and cannot include in their insurance policies.[1] It is well-established that a law which regulates what terms insurance companies can place in their policies regulates insurance companies. *See*, *e.g., Kentucky Ass'n*, 538 U.S. at 337 (citing *Rush Prudential*, 536 U.S. at 355); *UNUM Life Ins. Co. of Am. v. Ward*, 526 U.S. 358 (1999) (upholding a rule that required insurers to demonstrate prejudice before denying untimely claims); *Metropolitan Life Ins. Co. v. Massachusetts*, 471 U.S. 724 (1985) (upholding Massachusetts rule dictating a minimum amount of mental

---

[1]Furthermore, there is no evidence in the record to suggest that Morrison would allow any insurance company to issue forms containing "misleading . . . conditions which deceptively affect the risk purported to be assumed in the general coverage of the contract." Mont. Code Ann. § 33-1-502. Although the impact of the Commissioner's refusal to approve discretionary clauses is felt by the ERISA subsegment of the insurance market, his powers are part of a larger regulation of allegedly unfair and misleading practices in the insurance industry as a whole.

health coverage in medical insurance plans). That an insurance rule has an effect on third parties does not disqualify it from being a regulation of insurance. *See Kentucky Ass'n*, 538 U.S. at 337 (noting that the regulation in question would change the options open to third parties but holding that this did not alter the nature of the regulation).

**[4]** We agree with the Sixth Circuit's decision in *American Council of Life Insurers v. Ross*, 558 F.3d 600 (6th Cir. 2009). In that case, the Sixth Circuit confronted a Michigan prohibition on discretionary clauses. It concluded, as we do, that "[g]iven that the rules impose conditions only on an insurer's right to engage in the business of insurance in [the state,] . . . the rules are directed toward entities engaged in the business of insurance." *Id.* at 605.

2

Standard next argues that the practice is not specifically directed at insurers because it merely applies "laws of general application that have some bearing on insurers." *Kentucky Ass'n*, 538 U.S. at 334. To Standard, the practice is nothing more than an attempt to apply the common-law rule that contracts are interpreted against their drafter.

The cases Standard offers in support involve basic common-law rules which were applied to a wide variety of contracts. For instance, in *Pilot Life Insurance Co. v. Dedeaux,* 481 U.S. 41, 48-49 (1987), the Supreme Court found suits for "tortious breach of contract" or "the Mississippi law of bad faith" preempted under ERISA. The Court looked to "common-sense" to determine whether the state law was merely general in application, noting that the law applied to any insurance contract in the state and allowed for punitive damages. *Id.* at 50. The court observed that the law of bad faith was "no more 'integral' to the insurer-insured relationship than any State's general contract law is integral to a contract made in that State." *Id.* at 51. Finally, the law

"developed from general principles of tort and contract law available in any Mississippi contract case." *Id.* In the end, the Mississippi statute was not applicable because it was preempted by the exclusive remedial provisions of ERISA. *Id.* at 52 (citing 29 U.S.C. § 1132(a)).

Likewise, we held in *Security Life Insurance Co. v. Meyling*, 146 F.3d 1184 (9th Cir. 1998), that certain provisions of California insurance law governing contract recission were preempted. We noted that the provisions at issue could not "be readily distinguished from California's common law" as borne out in cases involving used cars, coin-operated machines, and real estate. *Id.* at 1189.

**[5]** However, the practice here—the disapproval of insurance forms which contain discretionary clauses—is specific to the insurance industry. The practice admittedly achieves some of the same ends as the common-law *contra proferentem* rule. It is, however, unexceptional that most state policies would further somewhat similar conceptions of the public interest. In any event, the state does not require approval of most contracts; its requirement that insurance forms be approved by the Commissioner is an expression of its special solicitude for insurance consumers. Thus, the state's bar on discretionary clauses addresses an insurance-specific problem, because discretionary clauses generally do not exist outside of insurance plans.

This view finds support in *UNUM Life*, which upheld California's notice-prejudice rule as falling under the savings clause. The rule required that an insurer show substantial prejudice before denying a claim based on untimely filing. The court first looked to common sense. 526 U.S. at 368 ("The rule thus appears to satisfy the common-sense view as a regulation that homes in on the insurance industry and does not just have an impact on [that] industry." (internal quotation marks omitted)). The Court rejected the insurer's view "that the notice-prejudice rule [was] merely an industry-specific

application of the general principle that disproportionate for-feiture should be avoided in the enforcement of contracts," stating:

> It is no doubt true that diverse California decisions bear out the maxim that "law abhors a forfeiture" and that the notice-prejudice rule is an application of that maxim. But it is an application of a special order, a rule mandatory for insurance contracts, not a principle a court may pliably employ when the circumstances so warrant. . . . In short, the notice-prejudice rule is distinctive most notably because it is a rule firmly applied to insurance contracts, not a general principle guiding a court's discretion in a range of matters.

*Id.* at 369-71 (internal quotation marks and citations omitted).

**[6]** Here, the Commissioner's practice forces all insurers to omit discretionary clauses; it is more than "a principle [which] may [be] pliably employ[ed] when the circumstances so warrant." *Id.* at 371. If it is an application of the general rule that contracts are interpreted against their drafters, it is clearly "an application of a special order." *Id.* Furthermore, the Supreme Court found the "grounding" of the notice-prejudice rule "in policy concerns specific to the insurance industry" to be "key" to its decision. *Id.* at 372. Likewise, Morrison's practice is grounded in policy concerns specific to the insurance industry, such as ensuring fair treatment of claims by insurers with potential conflicts of interest. It is indeed directed at insurance companies.

B

1

Turning now to the second *Kentucky Ass'n* prong, Standard asserts that the disapproval of discretionary clauses does not

substantially affect the risk pooling arrangement. *See Kentucky Ass'n*, 538 U.S. at 338. Insurance companies' core function is to accept a number of risks from policyholders in exchange for premiums. Some of the risks accepted will result in actual losses. Risk pooling involves spreading losses "over all the risks so as to enable the insurer to accept each risk." *Union Labor Life Ins. Co. v. Pireno*, 458 U.S. 119, 127-28 & n.7 (1982). By receiving a large number of relatively small premiums, the insurer can afford to compensate the few insureds who suffer losses. In this way, the insured no longer bears more than a small amount of his own risk—it has been transferred into a common pool into which all members of the pool contribute by paying premiums.

[7] The requirement that insurance regulations substantially affect risk pooling ensures that the regulations are targeted at insurance practices, not merely at insurance companies. *See Kentucky Ass'n*, 538 U.S. at 338 (noting that, absent the risk pooling requirement, "any state law aimed at insurance companies could be deemed a law that regulates insurance" (internal quotation marks omitted)). For instance, a state law requiring insurers to pay their janitors twice the minimum wage would not regulate insurance because it would have no effect on the risk-pooling relationship between insurers and the insured. *Id.* Standard argues for a definition of risk pooling that it claims is used in the insurance industry. According to such definition, risk is pooled at the time the insurance contract is made, not at the time a claim is made. "Administrative factors" such as "claim investigations, the appeals process, and litigation" can "affect amounts paid to insureds under [a] policy," but are outside of the risk pooling arrangement. We cannot accept such narrow conception, as a review of the Supreme Court's case law demonstrates that risk pooling extends to a much wider variety of circumstances than Standard's definition would suggest.

For instance, in *Kentucky Ass'n*, the state passed an "Any Willing Provider" ("AWP") statute, which forbade insurance

companies from discriminating against any doctor who is willing to meet the terms and conditions of the health plan. *Id.* at 331-32. This was enough to affect risk pooling substantially: "[b]y expanding the number of providers from whom an insured may receive health services, AWP laws alter the scope of permissible bargains between insurers and insureds . . . . No longer may Kentucky insureds seek insurance from a closed network of health-care providers in exchange for a lower premium." *Id.* at 338-39. Accordingly, the "AWP [rule] substantially affect[ed] the type of risk pooling arrangements that insurers may offer." *Id.* at 339.

**[8]** Montana insureds may no longer agree to a discretionary clause in exchange for a more affordable premium. The scope of permissible bargains between insurers and insureds has thus narrowed. The Supreme Court has repeatedly upheld similar scope-narrowing regulations. *See, e.g.*, *Rush Prudential*, 536 U.S. at 355 (scope of permissible bargains narrowed in that consumers could not agree to waive independent review of a medical decision); *UNUM Life*, 526 U.S. at 358 (scope narrowed in that insureds cannot reject notice-prejudice rule); *Metro. Life*, 471 U.S. at 724 (denying insureds the ability to accept plans without minimum mental-health coverage). The Sixth Circuit, furthermore, recently upheld a prohibition on discretionary clauses nearly identical to that in this case, reasoning that "Michigan's rules substantially affect the risk-pooling arrangement between insurers and insureds because they alter the scope of permissible bargains between insurers and insureds." *Ross*, 558 F.3d at 606 (internal quotations omitted).

**[9]** As the district court put it: "Like the notice-prejudice rule at issue in *UNUM*, Morrison's disapproval of discretionary clauses 'dictates to the insurance company the conditions under which it must pay for the risk it has assumed.' " *Std. Ins. Co. v. Morrison*, 537 F. Supp. 2d 1142, 1151 (D. Mont. 2008) (quoting *Kentucky Ass'n*, 538 U.S. at 339 n.3). One could go even further: consumers can be reasonably sure of

claim acceptance only when an improperly balking insurer can be called to answer for its decision in court. By removing the benefit of a deferential standard of review from insurers, it is likely that the Commissioner's practice will lead to a greater number of claims being paid. More losses will thus be covered, increasing the benefit of risk pooling for consumers.

2

Standard next asserts that "[r]isk does not concern 'legal risks' borne by the insured or insurer, such as the availability of extra-contractual remedies." It may well be true that risk pooling does not contemplate damages for a bad faith breach of contract, *see Pilot Life*, 481 U.S. at 50, or factor in the burden of contract misrepresentations, *see Meyling*, 146 F.3d at 1189; *see also Provident Life & Accident Co. v. Sharpless*, 364 F.3d 634 (5th Cir. 2004). However the only risk at issue here is the risk of the insured's becoming disabled—the risk that the insurance company has contracted for, not a 'legal risk' created by state tort law or contract law. The Commissioner's practice merely alters the terms by which the presence or absence of the insured contingency is determined. It indeed affects the risk pooling arrangement.

C

**[10]** Accordingly, the Commissioner's practice is "specifically directed toward entities engaged in insurance," *Kentucky Ass'n*, 538 U.S. at 342, and it "substantially affect[s] the risk pooling arrangement between the insurer and the insured," more so than other laws which have been upheld by the Supreme Court. The practice of disapproving discretionary clauses is thus saved from preemption under 29 U.S.C. § 1144(a) by the savings clause in section 1144(b).

### III

### A

ERISA provides an exclusive remedial scheme for insureds who have been denied benefits. 29 U.S.C. § 1132(a). An insured may sue "to recover benefits due to him under the terms of his plan, to enforce his rights under the terms of the plan, or to clarify his rights to future benefits under the terms of the plan." *Id.* § 1132(a)(1)(B). He may also seek an injunction or other appropriate equitable relief to enforce the provisions of ERISA or of the plan. *Id.* § 1132(a)(3).

**[11]** Standard asserts that the Commissioner's practice conflicts with this exclusive scheme. As the Supreme Court has stated:

> [T]he detailed provisions of § [1132](a) set forth a comprehensive civil enforcement scheme that represents a careful balancing of the need for prompt and fair claims settlement procedures against the public interest in encouraging the formation of employee benefit plans. The policy choices reflected in the inclusion of certain remedies and the exclusion of others under the federal scheme would be completely undermined if ERISA-plan participants and beneficiaries were free to obtain remedies under state law that Congress rejected in ERISA.

*Aetna Health v. Davila*, 542 U.S. 200, 208-09 (2004) (quoting *Pilot Life*, 481 U.S. at 54). Accordingly, "any state-law cause of action that duplicates, supplements, or supplants the ERISA civil enforcement remedy conflicts with the clear congressional intent to make the ERISA remedy exclusive and is therefore pre-empted." *Aetna Health*, 542 U.S. at 209.

In *Aetna Health*, the Court declared preempted a state law which allowed insureds to receive damages when insurers

failed to " 'exercise ordinary care when making health care treatment decisions.' " *Id.* at 205 (quoting Tex. Civ. Prac. & Rem. Code Ann. § 88.002 (1997)). ERISA already provides several remedies for disgruntled litigants, including preliminary injunctions and restitution under 29 U.S.C. § 1132(a)(1)(B). *Aetna Health*, 542 U.S. at 211. However, only the value of the lost claim is recoverable under the statutory remedies. Because the state statute allowed for recovery of a greater scope of damages, it upset "the careful balancing" Congress engaged in when crafting the "limited remedies under ERISA"; the state law may have "ensur[ed] fair and prompt enforcement of rights" but at the cost of discouraging employers from creating plans. *Id.* at 215 (internal quotation marks omitted). The state could not second-guess Congress's weighing of these factors by allowing for enhanced recoveries.

**[12]** Here, however, there is no additional remedy. Insureds may only recover the value of the denied claim from their insurers. The practice neither "authorize[s] any form of relief in state courts" nor "serve[s] as an alternate enforcement mechanism[ ] outside of ERISA's civil enforcement provisions." *Am. Council of Life Ins.*, 558 F.3d at 607; *see also Aetna Health*, 542 U.S. at 218 ("[E]ven a state law . . . regulating insurance will be pre-empted if it provides a separate vehicle to assert a claim for benefits outside of, or in addition to, ERISA's remedial scheme." (internal quotation marks omitted)). While it is true that the Commissioner's practice will lead to de novo review in federal courts, this is hardly foreign to the ERISA statute. Indeed, de novo review is the default standard of review in an ERISA case. *Firestone Tire*, 489 U.S. at 115. Because the practice merely forces ERISA suits to proceed with their default standard of review, it cannot be said to "duplicate[ ]," "supplement[ ]," or "supplant[ ]" the ERISA remedy. *Aetna Health*, 542 U.S. at 209. Since it adds nothing the ERISA scheme does not already contemplate, the practice is distinguishable from cases in which a state attempts to meld a new remedy to the ERISA frame-

work. *See id.* at 215; *cf. Pilot Life*, 481 U.S. at 50; *Ingersoll-Rand v. McClendon*, 498 U.S. 133 (1990) (declaring pre-empted a state law claim for mental anguish and future lost wages for a discharge in violation of ERISA).

B

Finally, Standard argues that a state's forbidding discretionary clauses is inconsistent with the purpose and policy of the ERISA remedial system, which emphasizes a balance between protecting employees' right to benefits and incentivizing employers to offer benefit plans. It relies on the Supreme Court's decision in *Metropolitan Life Insurance Co. v. Glenn*, 128 S. Ct. 2343 (2008). There, the Court noted that a conflict of interest exists when the entity determining eligibility for benefits also bears the financial burden of paying for them. *Id.* at 2348. However, the Court rejected a call to repudiate *Firestone Tire* and instead retained the abuse-of-discretion standard (albeit tempered by consideration of the conflict), saying that it "would [not] overturn *Firestone* by adopting a rule that in practice could bring about near universal review by judges *de novo—i.e.*, without deference—of the lion's share of ERISA plan claims denials." *Id.* at 2350. "Had Congress intended such system," the Court continued, "it would not have left to the courts the development of review standards but would have said more on the subject." *Id.*; *see also Taft v. Equitable Life Assurance Soc'y*, 9 F.3d 1469, 1472 (9th Cir. 1993) ("Nothing in the legislative history suggests that Congress intended that federal district courts would function as substitute plan administrators."); *cf. also Varity Corp. v. Howe*, 516 U.S. 489, 497 (1996) (noting that "courts may have to take account of competing congressional purposes, such as . . . [Congress's] desire not to create a system that is so complex that administrative costs, or litigation expenses, unduly discourage employers from offering [employee] welfare plans in the first place.").

Accordingly, we must balance ERISA's preemptive scope with its "antiphonal" acceptance of state insurance regulation.

*Rush Prudential*, 536 U.S. at 364. *Glenn* involved an exercise of the Court's power to make federal common law, as evidenced by its frequent reference to trust law and the absence of any applicable state insurance regulation. The Court's refusal to create a system of universal de novo review does not necessarily mean that states are categorically forbidden from issuing insurance regulations with such effect. After all, the states have retained power to institute quite a number of rules affecting ERISA plans pursuant to their savings clause powers. *See, e.g.*, *Kentucky Ass'n*, 538 U.S. at 329; *Rush Prudential*, 536 U.S. at 355; *UNUM Life*, 526 U.S. at 358; *Metro. Life*, 471 U.S. at 724.

The effect of disapproving discretionary clauses on ERISA plans is unclear. The *Firestone Tire* Court noted concerns "that a *de novo* standard would contravene the spirit of ERISA because it would impose much higher administrative and litigation costs and therefore discourage employers from creating benefit plans," but found them insufficient to justify a departure from a de novo standard where there was no discretionary clause. *Firestone Tire*, 489 U.S. at 114-15. *Firestone Tire* and *Glenn* read together may suggest that Congress would prefer a system in which many if not most cases were reviewed for an abuse of discretion. Yet, *Firestone Tire*'s explicit acceptance of the de novo standard, coupled with *Glenn*'s acknowledgment that the conflict of interest could prove "of great importance" in some cases, 128 S. Ct. at 2351, indicates that highly deferential review is not a cornerstone of the ERISA system.

Indeed, the Supreme Court has said as much. In *Rush Prudential*, the insurer argued that deferential review was a "substantive rule intended to be preserved by the system of uniform enforcement." 536 U.S. at 384. The Court made quick work of this argument: "Whatever the standards for reviewing benefit denials may be, they cannot conflict with anything in the text of the statute, which we have read to require a uniform judicial regime of categories of relief and

standards of primary conduct, not a uniformly lenient regime of reviewing benefit determinations." *Id.* at 385.

C

**[13]** Instead, the Court stated that it was perfectly appropriate for the state to "eliminate[ ] whatever may have remained of a plan sponsor's option to minimize scrutiny of benefit denials." *Id.* at 387. In *Rush Prudential*, the state had "eliminat[ed] an insurer's autonomy to guarantee terms congenial to its own interests" by requiring an independent medical review when the patient's doctor and the HMO disagreed about medical necessity. *Id.* That, however, was merely "the stuff of garden variety insurance regulation through the imposition of standard policy terms." *Id.* And ensuring a level playing field for claims is at the heart of the state's power to regulate insurance: "[i]t is . . . hard to imagine," said the Court, "a reservation of state power to regulate insurance that would not be meant to cover restrictions of the insurer's advantage in this kind of way." *Id.*

**[14]** Here, the Commissioner has likewise forbidden insurers from inserting terms which tip the balance in their favor. Although this creates disuniformities in the regime of rights and remedies under ERISA,

> [s]uch disuniformities . . . are the inevitable result of the congressional decision to save local insurance regulation. Although we have recognized a limited exception from the saving clause for alternative causes of action and alternative remedies . . . , we have never indicated that there might be additional justifications for qualifying the clause's application. . . . [*F*]*urther limits on insurance regulation preserved by ERISA are unlikely to deserve recognition.*

*Id.* at 381 (emphasis added) (internal citation omitted).[2]

**[15]** We decline to create an additional exception from the savings clause here. Like the regulatory scheme in *Rush Prudential*, the Commissioner's practice "provides no new cause of action under state law and authorizes no new form of ultimate relief." *Id.* at 379. The *Rush Prudential* court emphasized that the scheme in that case "does not enlarge the claim beyond the benefits available" and does not grant relief other than "what ERISA authorizes in a suit for benefits under § 1132(a)." *Id.* Neither does the Commissioner's practice.

**[16]** In a way, the Commissioner's practice is considerably more consistent with ERISA policy than was the scheme in *Rush Prudential*. Dissenting in that case, Justice Thomas argued that the independent review was "wholly destructive of Congress's expressly stated goal of uniformity." *Id.* at 400 (Thomas, J., dissenting). In response, the Court noted the limited nature of the review, denying that it was functionally a state-created arbitration system. *See id.* at 383-84 (majority op.). In the case at bar, the ultimate decisionmaking entity— the federal district court—is the one foreseen by Congress and not a creature of state law. The familiar processes of the federal courts—the Federal Rules of Civil Procedure and the like —still control the proceeding. And although the Commissioner's practice may force a neutral standard of review, that standard has long been accepted as an appropriate one for ERISA litigation. Given the acceptability of the decisionmaker, the decisional process, and the standard of review, it cannot be said that the Commissioner's practice requires "procedures so elaborate, and burdens so onerous, that they might undermine

---

[2]The insurance company in *Rush Prudential* argued "for going beyond *Pilot Life*, making the preemption issue here one of degree, whether the state procedural imposition interferes unreasonably with Congress's intention to provide a uniform federal regime of 'rights and obligations' under ERISA." *Id.* at 381. At its core, Standard's argument is of the same order, although it focuses less on disuniformity than on Congress's intent to control administrative and litigation costs.

§ 1132(a)." *Id.* at 381 n.11. The effects of the Commissioner's practice do not appear to "impose burdens on plan administration" due to disuniformity at all. *Id.*

D

**[17]** The Commissioner's practice is directed at the elimination of insurer advantage, a goal which the Supreme Court has identified as central to any reasonable understanding of the savings clause. It creates no new substantive right, offers no additional remedy not contemplated by ERISA's remedial scheme, and institutes no decisionmakers or procedures foreign to ERISA. The Commissioner's practice does not fall within the current scope of the exception to the savings clause. Given "that the historic police powers of the States were not [meant] to be superseded by [ERISA] unless that was the clear and manifest purpose of Congress," *id.* at 365, we decline to extend the scope of that exception.

IV

The Commissioner's practice regulates insurance because it is "specifically directed toward entities engaged in insurance . . . [and] substantially affect[s] the risk pooling arrangement between the insurer and the insured." *Kentucky Ass'n*, 538 U.S. at 342 (internal citations omitted). Although we acknowledge the tension between the Commissioner's practice and federal common law concerning the standard of review, we see nothing that would justify taking the extraordinary step of creating a new exclusion under the savings clause. Accordingly, we agree with the district court that the Commissioner's practice of disapproving discretionary clauses is not preempted by ERISA's exclusive remedial scheme.

**AFFIRMED.**