Mary Beth FAULKNER, Plaintiff,

v.

HARTFORD LIFE AND ACCIDENT INSURANCE COMPANY, et al., Defendants.

No. CIV. S–11–0408 LKK/CKD.

United States District Court, E.D. California.

March 16, 2012.

Amanda S. Uhrhammer, Spinelli, Donald & Nott, Sacramento, CA, for Plaintiff.

Dennis G. Rolstad, Erin Ann Cornell, Sedgwick, LLP, San Francisco, CA, for Defendants.

## ORDER

LAWRENCE K. KARLTON, Senior District Judge.

This is a case brought under the Employee Retirement Income Act of 1974 ("ERISA"), 29 U.S.C. § 1001, *et seq.* Mary Beth Faulkner challenges the termination of her disability benefits by defendant Hartford Life & Accident Ins. Co. ("Hartford"). For the reasons set forth below, plaintiff's motion for summary judgment is **GRANTED,** and defendant's cross-motion for summary judgment is **DENIED.**

### SUMMARY

Plaintiff Mary Beth Faulkner was bitten by a tick while camping with her family in Maryland. Soon after, she began complaining of debilitating fatigue and other symptoms. She was examined and treated by several physicians and diagnosed with Lyme Disease (among other diagnoses). These physicians did not agree on the etiology of her complaints,[1] but they all agreed that Faulkner was suffering fatigue and other debilitating symptoms, that the symptoms were real, and that they prevented her from working on a full-time basis. On December 20, 2003, the Social Security Administration determined that Faulkner was disabled (effective October 20, 2001), and awarded her benefits.[2] It reached the same conclusion again on October 19, 2005.[3] Hartford itself concluded that plaintiff, who was covered by Hartford's disability policy, was disabled by these symptoms, and awarded her short-term disability benefits and then long-term disability benefits. It conducted periodic reviews of plaintiff's medical records, and concluded each time that she was indeed disabled and unable to work.

However, in 2008, Hartford thought that it had detected a discrepancy in her treating physician's statements, and initiated a fraud investigation of plaintiff's claim. After conducting a surreptitious surveillance of plaintiff, and finding no fraud, Hartford hired a series of reviewers who concluded that Faulkner was not disabled (one of them concluded, contrary to Hartford's own conclusions, that she had never been sick), and that she could work. Based on the views of these hired reviewers, Hartford terminated Faulkner's disability bene-

---

1. The various etiologies were Lyme disease, encephalopathy, chronic fatigue syndrome, Bartellenosis (Bartonella), Babeosis, fibromyalgia, and neuroborreliosis.

2. Dkt. No. 36 (Defendant's Response to Plaintiff's Statement of Undisputed Facts) ¶ 20; AR 788 (Dkt. No. 19–8). On May 9 and June 19, 2002, Hartford wrote to plaintiff asking (or requiring) her to apply for Social Security Disability benefits ("SSDI") through the appeal process, as it appeared that her disability would last over 12 months. Dkt. No. 36 ¶ 11 (May 9, 2002); AR 864 (Dkt. No. 19–9) (June 19, 2002). Plaintiff's claim was initially denied in October 2002. Dkt. No. 36 ¶ 11; AR 839 (Dkt. No. 19–9). Plaintiff appealed the denial on November 30, 2002. Dkt. No. 36 ¶ 20; AR 821 (Dkt. No. 19–9).

3. Dkt. No. 36 ¶ 25; AR 618 (Dkt. No. 19–7). This was apparently the decision on appeal. The Social Security Administration had previously informed plaintiff that her benefits would cease in May 2005. Dkt. No. 36 ¶ 23; AR 729 (Dkt. No. 19–8).

fits. Faulkner sues here seeking reinstatement of the benefits.

## I. BACKGROUND

Starting March 15, 1999, plaintiff worked as a tax consultant for PricewaterhouseCoopers LLP ("PwC").[4] In July 1999, plaintiff became covered by defendant PricewaterhouseCoopers LLP Health & Welfare Benefits Plan (the "Plan").[5] The Plan is an employee benefit plan sponsored by plaintiff's employer PwC.[6] The Plan was administered and insured by defendant Hartford Life & Accident Ins. Co.[7] The Plan confers on Hartford "full discretion and authority to determine eligibility for benefits."[8] Accordingly, in its fiduciary capacity as administrator ("claims review fiduciary"), Hartford determines whether a claim should be paid under the policy,[9] and then either pays the claim or not, in accordance with its determination.[10]

**4.** Dkt. No. 36 (Defendant's Response to Plaintiff's Statement of Undisputed Facts) ¶ 2.

**5.** Administrative Record ("AR") 883 (Dkt. No. 19–9).

**6.** Dkt. No. 32 (Plaintiff's Response to Defendant's Statement of Undisputed Facts) ¶ 1.

**7.** Dkt. No. 36 ¶ 86. PwC is the Plan Administrator. However, "For purposes of claims administration, the Plan Administrator has assigned the fiduciary responsibility for claim determinations to Hartford Life & Accident Ins. Co., the Claims Administrator for this program." Policy ("POL") 037 (Dkt. No. 21–1).

**8.** Dkt. No. 32 ¶ 7.

**9.** "The people who operate your Plan, called 'fiduciaries' of the Plan, have a duty to do so prudently and in the interest of you and other Plan participants and beneficiaries." POL 039. The claims procedure is governed by federal regulations promulgated at 29 C.F.R. § 2560.503–1.

## A. Tick Bite and Initial Treatment; Plaintiff Is Treated by Dr. Mo.[11]

On May 19, 2001, while hiking with her family in Maryland, plaintiff was bitten by a tick.[12] She soon developed a bull's-eye expanding rash and came down with flu-like symptoms, including fatigue, fever, headaches, myalgia, weakness, facial pain and palsy, and dizziness.[13] On June 14, 2001, plaintiff visited Steven Mo, M.D., who was apparently her primary care doctor at that time.[14] Dr. Mo diagnosed plaintiff with "Lyme disease."[15] Plaintiff continued to be treated by Dr. Mo (June 2001 to December 2001), who reported on plaintiff's fatigue, lethargy, neurologic deficits, tremulous hands, inability to stand, walk or sit, and incapacitating symptoms.[16] Some of these findings were listed as examination findings and others were listed as subjective complaints. Dr. Mo never expressed any doubts about plaintiff's subjective complaints, and set the tone for the remainder of plaintiff's experiences when he noted that she was "unable to perform meaningful tasks for long."[17]

**10.** POL 018 (Dkt. No. 21–1).

**11.** Steven Mo, M.D.

**12.** Dkt. No. 36 ¶ 3.

**13.** Dkt. No. 36 ¶ 4.

**14.** *Id.* ¶ 5.

**15.** Dkt. No. 36 ¶ 5.

**16.** AR 973–74 (Dkt. No. 19–10) (10–26–2001: Lyme disease, fatigue, myalgias, patient "is unable to perform any meaningful tasks for long"); 971 (10–10–2001: fatigue); 945–46 (8–7–2001 [signed]: Lyme disease; re activities—"some days [patient] cannot do any of these activities for more than a few minutes"); 940–41 (9–5–2001: Lyme disease, significant fatigue complaints, at 50% capacity); AR 907 (10–1–2001: fatigue).
AR 897–98 (Dkt. No. 19–9) (11–30–2001 [signed] (Lyme disease, significant fatigue complaints, at 50% capacity)); 870–71 (12–19–2001 [signed]: Lyme disease, relapsing symptoms, sometimes incapacitating).

**17.** AR 973 (Dkt. No. 19–10).

On July 5, 2001, plaintiff was admitted to the hospital, where she was treated by Daniel P. Ikeda, M.D.,[18] and received IV antibiotic treatment.[19] In July 2001, plaintiff applied for short-term disability benefits under the Hartford policy.[20] Plaintiff's last day of work at PwC was July 15, 2001.[21] On August 20, 2001, Hartford approved the payment of short-term disability benefits to plaintiff, and subsequently extended payments through January 2, 2002, the maximum period for short-term disability benefits.[22]

### B. Plaintiff Is Treated by Dr. Ikeda.[23]

On January 11, 2002, Hartford approved the payment of long-term disability benefits to plaintiff, after finding that she was unable to work in her own occupation.[24]

Soon afterward, it appears that plaintiff began to be treated principally by Daniel P. Ikeda, M.D. (July 2001 to September 2004). Dr. Ikeda was clearly dubious about plaintiff's Lyme disease diagnosis.[25] Over the course of many examinations, he too noted her fatigue, although he indicated that it might be caused by fibromyalgia or chronic fatigue syndrome.[26] Indeed, he never expressed any doubts about plaintiff's subjective complaints. He was so doubtful of the Lyme disease diagnosis, however, that he scheduled plaintiff for a lab test, predicting confidently that it would be negative. The test came back positive, leading Dr. Ikeda to a new conclusion: "it suggests that Mary Beth continues to have persistent Lyme disease."[27]

### C. Plaintiff Is Examined by Dr.

**18.** Daniel P. Ikeda, M.D. of the Pulmonary Medicine, Infectious Disease and Critical Care Consultants Medical Group (Sacramento, Carmichael and Roseville, CA).

**19.** Dkt. No. 36 ¶ 6.

**20.** Dkt. No. 36 ¶ 9; AR 964 (Dkt. No. 19–10).

**21.** Dkt. No. 36 ¶ 2.

**22.** Dkt. No. 36 ¶ 10. *See also*, AR 968 (Dkt. No. 19–10) (extension through September 23, 2001); AR 966 (Dkt. No. 19–10) (extension through September 16, 2001); AR 935 (Dkt. No. 19–10) (extension through September 30, 2001); AR 900 (Dkt. No. 19–9) (extension through November 30, 2001). *See* AR 880 (Dkt. No. 19–9) (referring to extension through December 31, 2001).

**23.** Daniel P. Ikeda, M.D. of the Pulmonary Medicine, Infectious Disease and Critical Care Consultants Medical Group (Sacramento, Carmichael and Roseville, CA).

**24.** Dkt. No. 36 ¶ 13; AR 854 (Dkt. No. 19–9). Under the Hartford policy, plaintiff was disabled if, during the first five years of benefits, she was unable to work in her own occupation. POL 008 (Dkt. No. 21–1). After that period, plaintiff was disabled if she could not

work in any occupation. *Id. See also*, AR 883 (Dkt. No. 19–9) (12–19–2001: Application for Long–Term Disability Income Benefits, Employer's Statement); AR 872 (Dkt. No. 19–9) (same, Employee's Statement).

**25.** AR 696 (Dkt. No. 19–7) (3–22–2002: "I am not certain that she has Lyme disease whatsoever"); 692 (5–30–2002: "my impressions are that she probably no longer has active Lyme disease").

**26.** *See* AR 950–51 (Dkt. No. 19–10) (7–12–2001: Lyme Disease; becomes tired easily); AR 700 (7–12–2001: suspected Lyme disease), 698 (3–22–2002 [no exam]: fatigue symptoms); 691–92 (5–30–2002 [no exam]: "Fibromyalgia/chronic fatigue syndrome"); 687 (10–7–2002: persistent Lyme disease); 681 (4–29–2003: fatigue syndrome with improvement); 677 (11–19–2003: improved fatigue syndrome), 673 (6–8–2004: "? fatigue syndrome"), 671 (9–20–2004: suspected Lyme disease).

**27.** AR 688 (Dkt. No. 19–7) (October 7, 2002); 685 (11–7–2002: Lyme disease with positive Lyme dot blot test); 679 (8–15–2003: chronic Lyme disease, generally improved). Later, Dr. Ikeda came to the conclusion that after treatment, Lyme disease might no longer be

Liegner.[28]

On September 10, 2002, plaintiff was evaluated by Kenneth B. Liegner, M.D., of New York.[29] Dr. Liegner reported that despite the absence of laboratory substantiation, he had no doubt that plaintiff had Lyme disease.[30]

### D. Plaintiff is Treated by Dr. Green.[31]

Plaintiff was then examined and treated by Christine Green, M.D. (April 2002 to the present).[32] On April 27, 2002, Dr. Green wrote a letter to Hartford setting forth her view that plaintiff was disabled from Lyme disease, and proposing to treat

her for neuroborreliosis.[33] Like the doctors before her, Dr. Green consistently reports on plaintiff's fatigue and "cognitive trouble memory issues." [34] She diagnosed plaintiff with Lyme disease and encephalopathy, and concluded that plaintiff was "physically unable to stand, sit or walk consistently," and that she "has had real cognitive difficulty." [35] Dr. Green's notes consistently state that plaintiff has "shift work disorder ie cannot be alert for work." [36]

Dr. Green reported that plaintiff improved somewhat under her care, but remained disabled.[37] Dr. Green subsequently released plaintiff to work no more than 12 hours per week,[38] and eventually increased that to 18 hours per week.[39]

present. 673 (6–4–2004: "I am not convinced that this represents Lyme disease").

**28.** Kenneth B. Liegner, M.D. of Internal & Critical Care Medicine (Armonk, NY). Although Dr. Liegner examined plaintiff, he does not reappear in the Administrative Record, so it does not seem that this New York doctor ever became a treating physician for plaintiff.

**29.** Dkt. No. 36 ¶ 16.

**30.** "There is absolutely no laboratory substantiation of the diagnosis however the clinical presentation seems so clear that I would say a diagnosis of Lyme disease is definite." AR 835 (Dkt. No. 19–9).

**31.** Christine Green, M.D. of Green Oaks Medical Center, PC (Los Altos, CA).

**32.** Dr. Ikeda continued to treat plaintiff, also, at least until September 2004.

**33.** AR 858 (Dkt. NO. 19–9).

**34.** On September 8, 2003, Hartford wrote to Dr. Christine Green, plaintiff's treating physician, and requested the doctor's notes and lab tests for September 1, 2002 through the present. On September 30, 2003, Dr. Green sent Hartford the requested records. According to those records, on February 19, 2003, Dr. Green reported, among other things, that plaintiff did not have the stamina to work, could not get up to shower, and could not

drive to work. AR 804 (Dkt. No. 19–9). On March 26, 2003, Dr. Green reported, among other things, that the patient was "Overall better but unable to reliably work." AR 802 (Dkt. No. 19–9). On April 30, 2003, Dr. Green reported progress, and that the patient was "overall better," but also that she was "unable to reliably work." AR 800 (Dkt. No. 19–8). On June 23, 2003, plaintiff reported that she was "doing better," but also that "she still gets tired and will get off balance when she does." AR 798 (Dkt. No. 19–8).

**35.** AR 610 (Dkt. No. 19–7) (December 3, 2005). *See also* AR 759 (Dkt. No. 19–8) (March 2, 2004) (same; patient can only work every other day).

**36.** *E.g.,* AR 421 (Dkt. No. 19–5).

**37.** *See* AR 610 (Dkt. No. 19–7) (significant improvement with antibiotic, but still "physically unable to stand, sit or walk consistently," and "she has real cognitive difficulty").

**38.** Dkt. No. 36 ¶ 28; AR 590 (Dkt. No. 19–6) (January 9, 2006). Plaintiff thereupon took a part-time job for another accounting firm until it ran out of work for her. Dkt. No. 36 ¶ 29. During this employment, she always kept Hartford fully informed of her work status. *Id.; see also,* AR 572 (Dkt. No. 19–6) (May 1, 2006).

**39.** Dkt. No. 36 ¶ 29; AR 561 (Dkt. No. 16–6) (May 8, 2006).

### E. Hartford Confirms that Plaintiff Is Totally Disabled.

On August 31, 2006, Hartford advised plaintiff that going forward (effective January 3, 2007), she would be required to show that she was disabled such that she could not work in any occupation for which she was qualified.[40] On January 11, 2007, Hartford advised plaintiff that it had "conducted a thorough review of all the medical and vocational information" in her claim file.[41] Based upon that review, Hartford determined that plaintiff met "the policy definition of Disability," and that she would continue to receive long-term disability benefits.[42] In essence, Hartford told plaintiff that as of January 2007, it had determined that she was disabled even under its strictest standard, that is, her health prevented her from "performing one or more of the Essential Duties of Any Occupation."[43]

On June 8, 2007, Hartford began its first interim review of plaintiff's disability status since the change of her status in January 2007.[44] It attempted to obtain information from plaintiff's treating physician, but had trouble getting a proper response from the doctor.[45] Hartford then rejected Dr. Green's July 2007 Attending Physician Statement because it was "minimal," and accordingly, Hartford wrote directly to Dr. Green asking for copies of plaintiff's medical records.[46] The Administrative Record appears to be silent about the outcome of this back-and-forth, however, it appears that benefits continued. The court therefore infers that Hartford concluded that plaintiff continued to be totally disabled through September 4, 2008, when it requested another update.

On September 4, 2008, Kay McCormick, the Hartford claims specialist, again set about to get "updated information about your disability for our claim records."[47] The specialist gathered information about plaintiff's earnings at the time of her disability, and the amounts Hartford had paid out in benefits to plaintiff. She also requested information from Dr. Green.[48]

Dr. Green submitted office notes from September 22, 2008[49] and October 4, 2008,[50] and an Attending Physician Statement also dated October 4, 2008.[51] Hartford's current litigation position is that there was an "inconsistency between Dr. Green's restrictions and limitations on September 22, 2008 and October 4, 2008."[52]

The September 22, 2008 office notes indicate, among other things, that Dr. Green believes plaintiff could work 2 hours per day, 3–4 days per week. It reports that

---

40. Dkt. No. 36 ¶ 32; AR 047 (Dkt. No. 19–1). Previously, during in the first five years of benefits, plaintiff had to show only that she was unable to work in her own occupation.

41. AR 042 (Dkt. No. 19–1).

42. AR 042 (Dkt. No. 19–1).

43. *See* AR 047 (Dkt. No. 19–1) (August 31, 2006 letter setting out the definition of Disability under the policy).

44. AR 041 (Dkt. No. 19–1).

45. AR 039 (Dkt. No. 19–1).

46. AR 040 (Dkt. No. 19–1).

47. AR 033 (Dkt. No. 19–1).

48. It appears that Hartford had some trouble getting a response from Dr. Green. AR 025–26 (Dkt. No. 19–1). In addition, McCormick sought information from Dr. Michael Burman.

49. AR 421, Dkt. No. 19–5.

50. AR 420, Dkt. No. 19–5.

51. AR 452, Dkt. No. 19–5.

52. Defendants' Motion for SJ at 10 (Dkt. No. 20–1 at 16).

she has "Shift work disorder ie cannot be alert for her work," and that she is "still disabled." [53] The October 4, 2008 office notes indicate, among other things, that plaintiff has "Severe fatigue," that she has "Shift work disorder ie cannot be alert for her work," and that she is "still disabled." [54] The October 4, 2008 APS indicates, among other things, the plaintiff can sit for 6 hours, stand for 30 minutes and walk for 1 hour, with an intermittent need to recline or lie down. [55] However, Hartford's fill-in statement form for Attending Physicians (the "APS"), does not ask, nor provide a fill-in location to indicate, how many days per week these activities could be sustained.

Hartford does not explain what the inconsistency was. The only possibility for confusion the court can identify is that Dr. Green's statement on September 22nd states that plaintiff could work 2 hours per day, 3–4 days per week, while her October 4th statement is that plaintiff could sit six hours per day, in addition to standing and walking an additional 1.5 hours.

In fact, Dr. Green would later clarify, as she had previously clarified for Hartford, [56] although plaintiff could sit for six hours per day, she could only keep this up for 3 days per week, and that in any event, she could not sit for 6 hours in an office environment. [57] And even before 2007, Dr. Green had previously indicated that plaintiff could sit for 2 hours at a time, for up to six hours in a day. [58.] Hartford, had it reviewed Dr. Green's notes, would have seen that Dr. Green's notation of "2 hours" referred to the amount of work or sitting plaintiff could do *at a time*, and that plaintiff could do that 3 times in a day, for a total of 6 hours. Thus, it does not appear that there was any inconsistency, since in each case, Dr. Green was saying that plaintiff could work (sitting) for 2 hours at a time, three times per day (6 hours total per day), for three days in the week (18 hours total per week).

### F. Hartford Investigates Plaintiff for Fraud

Hartford never sought clarification from Dr. Green for what it now claims was an inconsistency in her reports. Instead, the Hartford claims specialist handling plaintiff's claim referred the matter to Hartford's Special Investigations Unit for a fraud investigation, stating that plaintiff "may have more functionality than what her AP [Attending Physician] has outlined." [59] The investigation included surreptitious surveillance of plaintiff. [60]

It appears that the investigation and surreptitious surveillance ended with no finding of fraud. To the contrary, the investigators found that plaintiff had "some functionality, but not consistent functionality" regarding her ability to lift (referring to lifting her baby into the car), bend at the waist (so that she can put the baby in a car seat) and open and close car doors. [61]

---

53. AR 421 (Dkt. No. 19–5).

54. AR 420 (Dkt. No. 19–5).

55. AR 452 (Dkt. No 19–5).

56. The medical forms sent to Dr. Green do not ask her to opine on how many days or hours in a week plaintiff could work. However, when Hartford specifically asked about this, in January 2007, Dr. Green advised Hartford that plaintiff could work no more than 18 hours in a week. AR 503 (Dkt. No. 19–6).

57. AR 380 (Dkt. No. 19–4) (February 21, 2009).

58. AR 512 (Dkt. No. 19–6).

59. AR 417 (Dkt. No. 19–5).

60. Dkt. No. 36 ¶ 39.

61. SIU [a part of the administrative record relating to the Special Investigation Unit] 020 (Dkt. No. 24–4).

### G. Hartford Hires Dr. Cohen[62] for an Independent Medical Examination.

On February 17, 2009, Hartford hired Michael Cohen, M.D., to provide an "independent" medical evaluation of plaintiff's condition.[63] Dr. Cohen examined plaintiff on March 16, 2009, and reviewed the medical records in her file. Dr. Cohen found that plaintiff suffered from "chronic fatigue syndrome, possibly related to tick bite/Lymed disease/Babesiosis disease."[64] Nevertheless, he found that plaintiff "does not have any cognitive deficit," could sit an unlimited number of hours in a day, stand, walk and lift 10 pounds during the day, bend at the waist, drive frequently, interact with colleagues and customers, endorse checks and can begin vocational rehabilitation. He does not, however, identify any part of the medical record, nor any part of his own examination that supported these conclusions.

Dr. Cohen does not address Dr. Green's contrary finding that plaintiff did have cognitive deficits. He does not address Dr. Green's contrary findings that plaintiff can only drive infrequently and for short distances. He does not address Dr. Green's contrary finding that plaintiff is not ready for vocational rehabilitation. He does not address Dr. Green's finding that plaintiff could only work 18 hours per week. He does not address Dr. Green's finding that plaintiff was totally disabled.[65]

In any event, Dr. Cohen does not opine on how many days a week plaintiff could keep up the activities he listed. He does not claim that plaintiff could work 40 hours a week, nor any more than the 18 hours per week established by Dr. Green. Dr. Cohen concluded that there was "no OBJECTIVE medical evidence to support total disability."[66] However, he did not opine that plaintiff was not totally disabled, and does not reject Dr. Green's finding that plaintiff was totally disabled. He does not explain what significance to give the absence of objective evidence versus all the examination findings and subjective complaints reported by all the doctors who had examined and/or treated plaintiff before him.

On April 1, 2009, Hartford again wrote to Dr. Green, this time asking her to comment on Dr. Cohen's evaluation. On April 19, 2009, Dr. Green strenuously objected to Dr. Cohen's report, and criticized Dr. Cohen's 1–hour examination[67] and record review.[68] She reiterated her view that plaintiff could not work more than half time, and noted that even assuming plaintiff could sit for 8 hours at a time, that did not mean she could sit *and* carry out cognitive functions during that time.

### H. Hartford Hires Dr. Mekjian[69] for a Neurophsychological Examination.

Hartford then hired Michael Z. Mekjian, Ph.D., to conduct a neuropsychological ex-

---

**62.** Michael Cohen, M.D. of Sutter Medical Group (Roseville, CA).

**63.** Dkt. No. 36 ¶ 40; AR 023–24 (Dkt. No. 19–1).

**64.** AR 369 (Dkt. No. 19–4) (March 16, 2009).

**65.** Although Dr. Green found that plaintiff could work 18 hours, plaintiff was still totally disabled under the policy, because she could not work 40 hours per week in any job for which she was qualified.

**66.** AR 370 (Dkt. No. 19–4) (emphasis in text).

**67.** Dr. Green does not state how she knows the examination lasted only one hour.

**68.** AR 359–61 (Dkt. No. 19–4).

**69.** Michael Z. Mekjian, Ph.D. of Neuropsychology, Psychodiagnostics & Forensics (Los Angeles, CA).

amination of plaintiff. Dr. Mekjian conducted a Neurophsychological exam on June 23, 2009. Although Hartford asserts that it requested this examination in response to Dr. Green's suggestion,[70] the record does not show why Hartford did not follow through on Dr. Green's other suggestions.[71] Dr. Mekjian concluded that:

> Ms. Faulkner is not functioning up to her fullest neurocognitive potential at the present time, and does show intermittent lapses in cognitive processing capacities which appear to primarily be secondary to fatigue affects which have an adverse impact on the patient's capacity to access her innate neurocognitive processing abilities. As previously noted, Ms. Faulkner does not exhibit any significant organic based neuropsychological deficits, but her neurocognitive functioning is adversely affected by her chronic fatigue.[72]

He also concluded that plaintiff's "fatigue levels clearly have a negative impact on her overall neurocognitive processing capacities [and her overall well-being] which

would most likely carry over into the workplace in terms of her general work capacities, work stamina and consistency of work performance."

Nevertheless, his final conclusion was that plaintiff's condition was not "sufficiently severe enough to render her Temporarily Totally Disabled[73] on either a neuropsychiatric or psychiatric basis[74] at the present time."[75] There is no substantive discussion of how plaintiff's neurocognitive impairments might play out in a 40–hour work week.

## I. The Claims Specialist Who Suspected Fraud Evaluates Plaintiff's Employability.

Hartford next obtained an Employability Analysis Report performed and prepared by Kay McCormick, the person who had just referred plaintiff for a fraud investigation.[76] Ms. McCormick concluded that plaintiff was qualified for her own occupation (but no other).[77] However, her report did not address whether plaintiff could do that occupation full time.[78]

---

70. Dkt. No. 36 ¶ 48; AR 349 (Dkt. No. 19–4) (May 26, 2009).

71. Dr. Green suggested "[1] neuropsychiatric testing, [2] Neurospect, [3] MRI, [4] measurement of neurological system such as EMG or sural nerve biopsies, and [5] other tests designed to rule out autoimmune or sequellae of Lyme disease." AR 360 (Dkt. No. 19–4). Hartford followed through only on the subjective neuropsychiatric testing, but not on any of the other, apparently objective tests Dr. Green suggested. Dr. Green also suggested [6] an ophthamalogical exam and [7] a mental status exam (AR 359), neither of which Hartford followed up on.

72. AR 346 (Dkt. No. 19–4).

73. There is no explanation in the record of what is meant by "Temporarily Totally Disabled," or whether it has anything to do with the definition of disability used in the Policy.

74. Dr. Mekjian is not a psychiatrist. There is no explanation in the record of how a non-psychiatrist can reach a reliable conclusion on a psychiatric matter.

75. Unsurprisingly, both sides claim that this report supports its case.

76. AR 286 (Dkt. No. 19–3) (August 18, 2009).

77. AR 287 (Dkt. No. 19–3) (August 18, 2009).

78. Indeed, none of the forms Hartford uses that appear in the Administrative Record permit the recording of how many hours *per week* a person can sustain the work or activities asked about. They only ask how many hours per day a person can work. In the case of Dr. Green, this led Hartford in January 2007 to conclude, erroneously, that plaintiff could work full-time. Dr. Green corrected Hartford's mis-interpretation of its own form, and plaintiff's benefits continued.

### J. Hartford Terminates Benefits and Plaintiff Appeals.

On September 8, 2009, Hartford terminated plaintiff's long-term disability benefits.[79] On December 8, 2009, plaintiff administratively appealed.[80] As part of the appeal process, Hartford, on January 19, 2010, hired University Disability Consortium ("UDC") to conduct a medical review.[81] Hartford asked UDC to review the medical information, and based upon that review, to:

identify the functional capacity the claimant can sustain with reasonable continuity including [1] amount of hours claimant can work per week, hours the claimant can sit, stand, walk in the workplace; [2] amount claimant can lift/carry/push/pull, drive, climb, balance, bend, stop, kneel, crouch, crawl, reach at waist level/ above shoulder level & below waist level, handle, finger & feel. [3] Please indicate any restrictions and limitations that are medically indicated for the period 9/9/09 to present.[82]

Hartford asked UDS to "Be Specific."[83] Finally, Hartford asked UDC to [4] perform a co-morbid review, to comment on [5] the Neuropsychological Evaluation, [6] claimant's cognitive ability as it relates to her functional capacity, and [7] claimant's level of fatigue as it relates to her functional capacity.[84] UDC assigned the reviews to Milton Jay, Ed.D., and Daniel P. McQuillen, M.D. On March 8, 2010, Hartford received reports from Dr. Jay and Dr. McQuillen.

Dr. McQuillen's report does not acknowledge that he has been asked to identify Faulkner's functional capacity with specific reference to how many hours Faulkner can work, and the other specific and enumerated issues. Instead, he acknowledges only the general request that he comment on "claimant's level of fatigue as it relates to her functional capacity."[85] Consistent with his apparent failure to understand what was being asked of him, Dr. McQuillen did not answer a single one of the specific questions Hartford wanted answered. Instead, Dr. McQuillen found—contrary to Hartford's own prior findings and the findings of every physician who had examined and treated plaintiff—that there was no evidence that plaintiff had *ever* been ill, and that he could find nothing that indicated she was impaired or had ever been impaired.[86]

Dr. Jay also did not acknowledge the specific questions that had been asked of him—how many hours could Faulkner work, and the other enumerated issues. He found that although plaintiff had cognitive problems traceable to her fatigue, she was not significantly impaired.[87] Dr. Jay reported almost exclusively on Dr. Mekjian's report, and Dr. Green's interpretation of it. He concluded that Dr. Green's interpretation of the Mekjian report was error, but that the Mekjian report was indeed flawed in several ways. Nevertheless, he relied on that report to conclude that plaintiff was not sufficiently impaired. Dr. Jay, also, fails to indicate how many hours plaintiff could work or carry out the list of activities he was asked about. Instead, like Dr. McQuillen, Dr. Jay only answers the general "comment" question, ignoring

---

79. Dkt. No. 36 ¶ 54; AR 011 (Dkt. No. 19–1).

80. Dkt. No. 36 ¶ 61; AR 163 (Dkt. No. 19–2).

81. Dkt. No. 36 ¶ 62; AR 153 (Dkt. No. 19–2).

82. AR 154 (Dkt. No. 19–2).

83. AR 154 (Dkt. No. 19–2).

84. AR 154 (Dkt. No. 19–2).

85. AR 127 & 137 (Dkt. No. 19–2).

86. AR 137 (Dkt. No. 19–2).

87. AR 144 (Dkt. No. 19–2).

the specific questions that he was engaged to answer.

Both reviewers submitted their reports on the same day, March 8, 2010.[88] That same day, at some time before 2:16pm, Hartford denied the administrative appeal.[89] In doing so, Hartford accepted the doctors' reports *in toto*, without comment or question, and without any apparent concern that the doctors had neglected to answer the questions they had been asked.[90] Plaintiff timely seeks judicial review of Hartford's decision.

## II. STANDARDS

ERISA provides that every ERISA plan shall "afford a reasonable opportunity to any participant whose claim for benefits has been denied for a full and fair review by the appropriate named fiduciary of the decision denying the claim." 29 U.S.C.A. § 1133(2). If the plan upholds the denial of the claim, the participant may bring an action in federal district court "to recover benefits due to him under the terms of his plan." 29 U.S.C. § 1132(a)(1)(B).

Once brought into court, the decision to deny benefits is treated like the determination of an agency, in that it comes to this court for "review." "In the ERISA context, the 'administrative record' consists of 'the papers the insurer had when it denied the claim.'" *See Montour v. Hartford Life & Acc. Ins. Co.*, 588 F.3d 623, 632 n. 4 (9th Cir.2009), *quoting Kearney v. Standard Ins. Co.*, 175 F.3d 1084, 1086 (9th Cir.), *cert. denied*, 528 U.S. 964, 120 S.Ct. 398, 145 L.Ed.2d 310 (1999).[91]

The question for this court is whether Hartford provided plaintiff with a "full and fair" review of its decision to terminate benefits. 29 C.F.R. § 2560.503–1(h)(1). To qualify as a "full and fair review," the administrative appeal decision by Hartford must not "afford deference to the initial adverse benefit decision," among other requirements. 29 C.F.R. § 2560.503–1(h)(3)(ii) & (h)(4).[92] In addition, where, as

---

**88.** AR 127 (Dr. McQuillen) & 138 (Milton Jay, Ed. D.). *See also*, AR 113 (March 16, 2009: Dr. McQuillen, Addendum).

**89.** AR 122–26 (Dkt. No. 19–2). At the hearing on this matter, counsel for Hartford argued that the appeal was not denied until March 16, 2009, after Dr. McQuillen had considered a submission by Dr. Green. This assertion is precluded by the administrative record, which is clear that the appeal was denied on March 8, 2010. AR 124; AR 103 (October 1, 2010) ("The Hartford's final appeal decision was made on March 8, 2010," notwithstanding Dr. Green's subsequent submission, and Dr. McQuillen's "addendum").

**90.** AR 002 (Dkt. No. 19–1). There is nothing in the record that states what time of day the UDC reports arrived at Hartford. However, the Administrative Records shows that Hartford viewed March 8, 2010 as an absolute deadline for issuing its determination on appeal. Accordingly, it does not appear that Hartford had any time to take a look at the reports or to notice that they were totally inadequate.

**91.** "The record that was before the administrator furnishes the primary basis for review." *Kearney*, 175 F.3d at 1090. As the Ninth Circuit has explained this rule:

> A primary goal of ERISA was to provide a method for workers and beneficiaries to resolve disputes over benefits inexpensively and expeditiously. Permitting or requiring district courts to consider evidence from both parties that was not presented to the plan administrator would seriously impair the achievement of that goal.

*Taft v. Equitable Life Assur. Soc.*, 9 F.3d 1469, 1472 (9th Cir.1993). It is important to recognize, however, that confining the administrative record in this way contains the danger of confusing the business records of an insurance company with the regulatory record accumulated by a governmental agency. This court is of course bound by the Ninth Circuit's rule, and so it will review the record compiled by the claim administrator as the "administrative record."

**92.** Section 2560.503–1(h)(3)(ii) applies to group health plans. However, Section 2560.503–1(h)(4) makes that section applicable to disability benefit plans, as well.

here, the benefit determination was "based in whole or in part on a medical judgment," Hartford was required to "consult with a health care professional who has appropriate training and experience in the field of medicine involved in the medical judgment." 29 C.F.R. § 2560.503–1(h)(3)(iii) & (h)(4).

Finally, Hartford imposed an additional condition on its own review. In sending the medical files to its medical reviewer (UDC), Hartford stated that "To maintain objectivity, any prior medical consultant reviews are not enclosed." AR 152 (Dkt. No. 19–2).[93]

■ The standard of review applicable here depends upon the language of the Plan itself:

> a denial of benefits challenged under § 1132(a)(1)(B) is to be reviewed under a *de novo* standard *unless the benefit plan gives the administrator or fiduciary discretionary authority to determine eligibility for benefits.*

*Firestone Tire and Rubber Co. v. Bruch,* 489 U.S. 101, 115, 109 S.Ct. 948, 103 L.Ed.2d 80 (1989) (emphasis added). Where the benefit plan does give the administrator or fiduciary such discretion, the court reviews the denial of benefits under the "abuse of discretion" standard. *Mitchell v. CB Richard Ellis Long Term Disability Plan,* 611 F.3d 1192, 1198 (9th Cir.2010). In this case, the Plan confers upon Hartford "full discretion and authority to determine eligibility for benefits." *Standard Ins. Co. v. Morrison,* 584 F.3d 837, 840 (9th Cir.2009), *cert. denied,* 560 U.S. ——, 130 S.Ct. 3275, 176 L.Ed.2d 1182 (2010).[94] Accordingly, the "abuse of

discretion" standard applies. *Id.,* 584 F.3d at 840.

■ However, there is a wrinkle in the standard of review because Hartford is both the fiduciary administrator and also the insurer. Thus, it has the fiduciary obligation to make benefit decisions that are in the best interests of the insured; thus, if the decision is that the claim is good, it has to pay. This burdens Hartford with a "structural conflict of interest." *Abatie v. Alta Health & Life Ins. Co.,* 458 F.3d 955, 965 (9th Cir.2006) (en banc) ("We have held that an insurer that acts as both the plan administrator and the funding source for benefits operates under what may be termed a structural conflict of interest"). The "abuse of discretion" standard still applies despite this conflict. *Abatie,* 458 F.3d at 965 ("Abuse of discretion review applies to a discretion-granting plan even if the administrator has a conflict of interest"). However, the conflict must be taken into account somehow, and generally requires the court to apply a level of skepticism in conducting its "abuse of discretion" review. *Salomaa v. Honda Long Term Disability Plan,* 642 F.3d 666, 676 (9th Cir.2011) (abuse of discretion standard applies, but "a higher degree of skepticism is appropriate where the administrator has a conflict of interest"); *Nolan v. Heald College,* 551 F.3d 1148, 1153 (9th Cir.2009) (same).

■ To this end, the court is instructed to "temper the abuse of discretion standard with skepticism 'commensurate' with the conflict." *Id.* This will require going outside the administrative record "to decide the conflict's 'nature, extent, and ef-

---

**93.** In spite of this, Hartford did send the medical reviews of Dr. Cohen and Dr. Mekjian to UDC, and the UDC reviewers relied upon those reports. Neither side discusses whether those reports are in fact "medical consultant reviews."

**94.** *Citing Firestone Tire & Rubber Co. v. Bruch,* 489 U.S. 101, 111, 109 S.Ct. 948, 103 L.Ed.2d 80 (1989).

fect on the decision-making process.' " *Id.* Moreover, the court must make its determination on the conflict *before* it considers whether the decision to terminate benefits was correct under the applicable standard. *Id.*

Next, the court must consider that the case comes before it on summary judgment. In the absence of a conflict, the summary judgment route is just the mechanism used to get the case before the court. Since the record on "appeal" is closed—it's the administrative record—the court simply decides the case based upon that record. In making the conflict determination, however, the court views that evidence "through the lens of the traditional rules of summary judgment."

## III. SUMMARY OF THE ARGUMENTS

Plaintiff argues that because of Hartford's structural conflict of interest, this court should view Hartford's decision with "significant skepticism," and should consider facts outside the administrative record in determining how much skepticism to apply. Apart from the structural conflict itself, plaintiff's argument is solely based on Hartford's use of UDC to provide doctors to review the records on appeal.[95]

Defendant argues that it has correctly managed the conflict. It submits evidence tending to show that that it takes many, many steps to ensure that its appeals decision-makers are not influenced by its profit motive.

## IV. DISCUSSION

The policy at issue here provides that after the initial 5-year period of long-term disability benefits, a person continues to be disabled only if she is prevented by sickness (or by some other specified cause) "from performing one or more of the Essential Duties" of any occupation. POL 008. One of the Essential Duties of an occupation is the ability to be "at work for the number of hours in Your regularly scheduled workweek." POL 008. It is undisputed that the physical requirements of plaintiff's job are frequent standing, walking, sitting, reaching and keyboard use, and 40 hours of work.[96]

### A. Conflict of Interest/Bias

■ The "abuse of discretion" standard applies in this case. The only issue here is whether the court should "temper" the standard with "skepticism" based upon the possible effect of the conflict on Hartford's decision-making. Under either view, however, Hartford's decision to terminate plaintiff's long-term disability benefits was an abuse of discretion.

### B. Plaintiff's Administrative Appeal

On January 19, 2010, Hartford referred plaintiff's case on appeal to University Disability Consortium for review. AR 153 (Dkt. No. 19–2). It asked UDC to answer several enumerated questions, as set forth above. On March 8, 2010, Hartford received two reports from UDC: (1) a March 8, 2010 report authored by Daniel McQuillen, M.D.; and (2) a March 8, 2010 report

---

**95.** Plaintiff relies on Judge Wilkens's opinion in *Caplan v. CNA Financial Corp.,* 544 F.Supp.2d 984 (N.D.Cal.2008). In *Caplan,* the district court received evidence regarding UDC's financial dependence on referrals from the insurer (Hartford Group Life Ins. Co., perhaps a different entity than involved here), evidence of the reviewing doctor's lop-sided findings of non-disability on claims submitted to him for review, his belief that "anybody

can work in a sedentary occupation," and his belief that only "objective findings," are acceptable indications of disability. 544 F.Supp.2d at 989–90.

**96.** AR 884 (Dkt. No. 19–9). Hartford's termination of benefits was based upon its finding that plaintiff could work at her own occupation. Accordingly, the requirements of her own job are the ones at issue here.

authored by Milton Jay, Ed.D. That same day, relying upon those reports, Hartford wrote to plaintiff denying her administrative appeal.

### 1. Dr. McQuillen's Report

Dr. McQuillen recapitulates at length (8 pages) the notes of others, and the lab results. The two parts of the report that appear to be his response to the questions put to him are his Diagnoses and Discussion, and his final conclusions.

### a. Diagnosis and Discussion

Dr. McQuillen's Diagnosis and Discussion centers entirely on his view that plaintiff does not have Lyme disease, Babesiosis or Bartonellosis. He states that plaintiff's diagnosis of Lyme Disease was based entirely on self-reporting by the patient, and that "The records reviewed do not contain any objective reports of this illness [Lyme Disease] by a treating physician at the time." AR 135 (Dkt. No. 19–2). He explains away a positive test result for the disease at some length by hinting that the laboratory was using inappropriate tests,[97] and then indicating that if plaintiff had Lyme Disease, the test results indicate that she was cured. He goes on to state that "The records reviewed do not substantiate a diagnosis of any *active* infectious illness for the period reviewed (6/01–2009)," and that "Clinical illness compatible with Babesiosis, Bartonellosis,

or Lyme disease is not present in the records reviewed." AR 137 (Dkt. No. 19–2). In short, plaintiff was never sick, not even during the period Hartford itself found that she was sick.[98]

### b. Final Conclusions

Dr. McQuillen concludes with the only comments he makes on the questions asked of him:

> The claimant's self-reported level of fatigue is not substantiated by the objective medical records and appears to overstate the findings in the medical records. The APS limitations also appear to overstate the objective medical findings in the medical records. I find no evidence in the medical records reviewed of a physical diagnosis that would impart *any* limitation to functional capacity.

AR 137 (Dkt. No. 19–2) (emphasis added). In short, plaintiff is not disabled, and was never disabled during the period June 2001 to the present.

### c. Analysis of McQuillen's Report

To put it mildly, there are several problems with McQuillen's report:

(1) It entirely fails to answer the very first question Hartford posed: how many hours was plaintiff able to work during the week, and what functional capacity she could sustain with reasonable continuity.[99]

---

**97.** In support, Dr. McQuillen quotes a CDC report. But he omits the following from the same report: "Health-care providers are reminded that a diagnosis of Lyme disease should be made after evaluation of a patient's clinical presentation and risk for exposure to infected ticks, and, if indicated, after the use of validated laboratory tests." *cdc.gov/mmwr/preview/mmwrhtml/mm5405a6.htm.* Dr. McQuillen does not indicate whether the testing he criticizes is in fact the type disapproved in the CDC report, and he ignores the CDC injunction that clinical presentation and risk for exposure to infected ticks is important, as

well as validated laboratory tests, "if indicated." Dr. McQuillen did not examine plaintiff.

**98.** The fact that he never saw plaintiff and that his conclusion contradicts every doctor who saw her, does not phase him at all.

**99.** McQuillen's dissertation on whether plaintiff had Lyme disease, and the proper testing methodologies are interesting, but as Hartford points out in its moving papers, whether plaintiff had a specific disease or not does not answer the question of whether she was disabled. Plaintiff could have Lyme disease and still be able to work, and conversely she could be free of Lyme disease but still be unable to work.

Instead, McQuillen avoids the questions by giving non-answers: the level of fatigue claimed is not supported by the record (without stating what level of fatigue, if any, is supported by the record); the limitations are overstated (but he does not say what the proper limitations are, if any); and he did not find evidence supporting a limitation to functional capacity (without saying whether plaintiff nevertheless had limitations on her functional capacity or whether Dr. Mo, Dr. Ikeda and Dr. Green were all wrong).[100] Critically, by failing to be specific (although specificity was requested) there is no way to know if Dr. McQuillen was saying that plaintiff had no functional capacity limitations relative to a 40–hour work week, or whether he was referring to the 18–hour work week for which plaintiff had already received a medical release from Dr. Green. It would have been extraordinary for Dr. McQuillen to be referring to a 40–hour work week, since no doctor who examined the plaintiff—including Dr. Cohen—had opined that plaintiff could complete a 40–hour work week. Dr. McQuillen did not examine the plaintiff, only the medical records.

(2) It is false in stating or insinuating that plaintiff's complaints were all her own subjective reports. The medical records contain the objective medical examinations and observations of Dr. Mo., Dr. Ikeda, Dr. Liegner, Dr. Green, and even the reviewers hired by Hartford, Dr. Cohen, Dr. Mekjian and Dr. Jay (McQuillen's co-reviewer). In essence, McQuillen completely discards, without explanation, the views of every other treating physician or other reviewer who had preceded him. Dr. McQuillen, and UDC, are not required to accord "special weight" the opinions of Faulkner's treating physicians. *Black & Decker Disability Plan v. Nord,* 538 U.S. 822, 834, 123 S.Ct. 1965, 155 L.Ed.2d 1034 (2003). However, neither may they "arbitrarily refuse to credit a claimant's reliable evidence, including the opinions of a treating physician." *Id.*

(3) It is false because there were positive lab findings of disease;[101] and

(4) The final conclusions have no apparent relationship to the Diagnosis and Discussion;

(5) Neither the discussion nor the findings address the contrary findings of every treating or examining physician or reviewer who saw plaintiff before McQuillen;[102] and

(6) Neither the discussion nor the findings address any other possible causes of plaintiff's fatigue—fibromyalgia, encephalopathy or chronic fatigue syndrome—that were diagnosed by the physicians who preceded McQuillen, and which were accepted by Hartford and SSA from 2001 until September 2008.

**100.** If McQuillen could not find the evidence he needed to answer Hartford's questions, he could have said so, and advised Hartford that he could not give them an opinion. Instead, he answers legalistically, as if ruling on whether plaintiff had met her burden of proof. But Hartford did not ask Dr. McQuillen if plaintiff met her burden of proof; it asked him to identify and quantify her functional capacities and limitations. He did not do so.

**101.** McQuillen says he "finds no evidence in the medical records reviewed of a physical diagnosis that would impart any limitation to functional capacity." But the records do contain evidence of such a physical diagnosis—fibromyalgia, Lyme disease, chronic fatigue syndrome, Bartonellis, Babeosis—that would impart limitations to plaintiff's functionality. And there are positive lab results for the Babeosis and Lyme disease, although they were outnumbered by the negative test results. *See* Dkt. No. 36 ¶¶ 74 & 76.

**102.** Dr. Quillen regurgitates their findings further mention of them, and does not analyze in any way.

## 2. Milton Jay, Ed.D.'s Report.

Dr. Jay reported several problems with Dr. Mekjian's report, the only report he mentions or relies upon. It is not completely clear to a lay decision-maker how serious all those problems were, but they appear to be important flaws.[103] Perhaps most important, Dr. Jay criticized Dr. Mekjian for conducting "no specific testing of sustained attention," even though plaintiff's ability to work 40 hours per week was the question of the day. Nevertheless, apparently using Dr. Mekjian's faulty test results, Dr. Jay concurred that plaintiff was not sufficiently impaired.

Worse, Dr. Jay seems to misrepresent, or at least grossly oversimplify, Dr. Mekjian's report and findings. Dr. Mekjian did find that "Ms. Faulkner does not exhibit any significant organic processing abilities." However, as discussed above, Dr. Mekjian found that "Ms. Faulkner is not functioning up to her fullest neurocognitive potential," that she shows "intermittent lapses in cognitive processing capacities ... which have an adverse impact on the patient's capacity to access her innate neurocognitive processing abilities," that "her neurocognitive functioning is adversely affected by her chronic fatigue," that her "fatigue levels clearly have a negative impact on her overall neurocognitive processing capacities," and that these levels would also negatively "carry over into the workplace in terms of her general work capacities, work stamina, and consistency of work performance." [104]

Without explanation, Dr. Jay interprets these findings as saying that Faulkner's cognitive impairments were minimal. Although Dr. Mekjian found, also without explanation, that plaintiff was not "Temporarily Totally Disabled," [105] he did not indicate that her impairments were minimal or incidental. To the contrary, the litany of adverse effects and impairments Dr. Mekjian described tend to establish disability, not to disprove it.

## 3. Hartford's Response to the UDC Reports

The Administrative Record shows that Hartford did not afford plaintiff a full and fair review of the denial of her benefits. Indeed, such a review appears to be precluded by Hartford's apparent mis-management of the appeal deadlines under which it operated both by regulation and by its own self-imposed limitations. According to the Administrative Record, Hartford received plaintiff's administrative appeal on December 11, 2009.[106] Including permitted extensions, Hartford faced a legal deadline of March 11, 2011 to make a determination on the appeal (an original 45 day determination period after receipt of the appeal, plus a 45–day extension).[107] 29 C.F.R. § 2560.503–1(i)(1)(I), 503–1(i)(3)(I).

The appeal was assigned to an appeals specialist, Jeff Jones, who referred the matter to UDC on January 19, 2010.[108] The referral document does not advise UDC when its review should be completed.

However, the appeals specialist was later advised that any decision granting ben-

---

**103.** Among other things, Dr. Mekjian us versions of intelligence and memory tests.

**104.** AR 346 (Dkt. No. 19–4).

**105.** There is no explanation of what Dr. Mekjian means by "Temporarily Totally Disabled," as that is not a term defined in the policy.

**106.** AR 163 (Dkt. No. 19–2).

**107.** The Administrative record shows that Hartford was aware of this deadline. The appeals specialist assigned to the case clearly understood this, and so advised plaintiff in a letter setting forth the applicable deadlines. AR 159 (Dkt. No. 19–2).

**108.** AR 153–54 (Dkt. No. 19–2).

efits (that is, overturning the termination of benefits) had to be made by March 8, 2011 (six months after the initial termination of benefits) because otherwise plaintiff would lose certain other benefits provided by PwC even if she received the long-term disability benefits.[109] To its credit, Hartford thereupon acted pursuant to the shorter deadline, and notified PwC that it would have its decision no later than March 8, 2010.[110]

On March 1, 2011, one week before Hartford's self-imposed deadline for deciding the appeal, the appeals specialist asked UDC for information on when its report would be completed.[111] He was advised that the UDC reviewers were working on it at that moment.[112] The UDC reports were completed on the exact date of Hartford's self-imposed deadline—March 8, 2010.[113] This situation inherently precluded the possibility of a full and fair review, unless the reports were so obviously flawless that they raised no questions and led inexorably to only one conclusion.[114] The reports Hartford received that day were nothing of the kind.

Indeed, Hartford, upon reading the reports, must have seen their deficiencies and the other issues they raised.[115] Most notably, it would have noticed that neither doctor answered the questions asked of them, that Dr. McQuillen's report completely undermined Hartford's own disability findings over the prior eight years, and that Dr. Jay's report severely criticized the report—Dr. Mekjian's, the only one he was asked to review—that Hartford relied upon in terminating plaintiff's benefits. Yet, Hartford adopted the report instantaneously, sending out its administrative denial before mid-afternoon of the same day both reports were received, March 8, 2010. There is no evidence in the record that Hartford asked either doctor to explain their findings or their failures to answer the questions asked of them, McQuillen's rejection of Hartford's own "thorough review" of plaintiff's medical records, or anything else. The report came out Hartford's way, and Hartford accepted it without any question or delay.[116]

Instead of questioning these obvious flaws, or rejecting the reports because of them, the Hartford appeal determination simply copied down the last two paragraphs of Dr. McQuillen's report, and the last two paragraphs of Dr. Jay's report, and concluded that based upon those reports, the appeal was denied.[117] This is not the consultation with health care professionals that Hartford was required to

---

109. Dkt. No. 36 ¶ 64; AR 149 (Dkt. No. 19–2).

110. AR 149 (Dkt. No. 19–2).

111. Dkt. No. 36 ¶ 65; AR 148 (Dkt. No. 19–2).

112. Dkt. No. 36 ¶ 65; AR 145 (Dkt. No. 19–2).

113. Dkt. No. 36 ¶ 66; AR 127 & 138 (Dkt. No. 19–2).

114. Hartford asserts that the March 8th deadline was "irrelevant and immaterial." Dkt. No. 36 ¶¶ 64 & 66. To the contrary, it was crucial to Hartford's inability to provide the "full and fair review" that it was legally obligated to provide Faulkner's appeal.

115. At least, Hartford would have seen the problems if it had taken any time to read the reports, rather than adopting them as soon as they were received.

116. In addition, this is conduct that inevitably raises the question whether this conflicted administrator was just looking for a way to terminate expensive, long-term disability benefits. Even accepting all of Hartford's attempts to erect walls between the financial people and the appeals section, this conduct is inherently suspicious, and justifies applying some skepticism to the court's "abuse of discretion" standard.

117. The rest of the determination letter itself simply recounted the history of the case and did not depend on the UDC reports.

conduct under the applicable regulations. *See* 29 C.F.R. § 2560.503–1(h)(3)(iii) & (h)(4) (requirement to "consult" with health care professional in determining appeals).

Meanwhile, the record contains overwhelming medical evidence in support of plaintiff's underlying disability claim. All of her treating physicians found that plaintiff was disabled, as discussed above. Although, as noted, there was disagreement about what was causing the disability, they all agreed that she was disabled, and could not work 40 hours per week. At most, Dr. Green found that she could possibly work 18 hours per week.

The record shows that she was not malingering—and Hartford makes no claim that she was. To the contrary, the record shows that Faulkner tried to work or volunteer at every opportunity, but relapsed when she tried to do so. Despite the overwhelming medical evidence of Faulkner's disability, and the complete absence of any evidence of any kind that she could work 40 hours—notwithstanding all the "independent" medical examinations and reviews Hartford purchased—Hartford terminated Faulkner's benefits.

The law requires that those benefits be restored.

## V. CONCLUSION

For the foregoing reasons

1. Plaintiff's motion for summary judgment is **GRANTED**. Plaintiff is awarded retroactive benefits from the date of termination of her benefits to the date of this order, and reinstatement of her benefits going forward. In addition, plaintiff may move for pre-judgment interest,[118] post-judgment interest if applicable,[119] and reasonable attorneys' fees and costs,[120] on a separate motion.

2. Defendant's motion for summary judgment is **DENIED**.

IT IS SO ORDERED.

---

118. *See Blankenship v. Liberty Life Assur. Co. of Boston,* 486 F.3d 620, 627 (9th Cir.2007) ("A district court may award prejudgment interest on an award of ERISA benefits at its discretion").

119. *See* 28 U.S.C. § 1961(a) (post-judgment interest allowed on money judgment in civil cases); *Dishman v. UNUM Life Ins. Co. of America,* 269 F.3d 974 (9th Cir.2001) (addressing the date post-judgment interest begins to run).

